45 N.J. Super. 75 (1957)
131 A.2d 578
LETITIA CROTTY, PETITIONER-APPELLANT,
v.
DRIVER-HARRIS CO., RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Hudson County Court, Law Division.
Decided April 22, 1957.
*77 Messrs. O'Brien, Brett & O'Brien, attorneys for petitioner-appellant (Mr. Thomas J. Brett, of counsel).
Mr. Edward B. Meredith, attorney for respondent-respondent.
NIMMO, J.C.C.
This is an appeal from a judgment of the Division of Workmen's Compensation dismissing the petitioner's dependency claim petition.
On January 28, 1955 the petitioner Mrs. Crotty filed a "Dependency Claim Petition for Compensation" against Driver-Harris Co. with the New Jersey Department of Labor and Industry, Division of Workmen's Compensation. At *78 the formal hearing on the petition, by agreement of the parties and with the permission of the Deputy Director, counsel stipulated all of the relevant facts.
These stipulations evolve into the following synopsis:
On October 8, 1954 James Crotty left his Nutley, N.J., home and went to his work in the respondent's foundry. During the course of his working day and on the premises of his employer he was murdered and robbed of his pay by a fellow employee. (Joseph Williams was tried and found guilty of this murder.)
James Crotty was over 70 years of age. He was employed as a stock clerk by the respondent in its foundry. The stockroom was located in the basement of the foundry. As stock clerk the decedent's duties included dispensing stock items from either the stockroom or the yard, and keeping an inventory of supplies. His jurisdiction in the yard extended to sand storage bins adjacent to a brick-shed, which shed is attached to the west side of the foundry building at its northern corner approximately 50 feet north from the west side door of the foundry building. This west side door leads to the yard. He had no duties with respect to the brick-shed or its contents. In his job Crotty did a lot of wandering in and about the foundry on occasions and wasn't confined strictly to his stockroom. In fact, the foundry manager indicated that Crotty was allowed to go out into the yard for a smoke or fresh air. It was in this brick-shed that two co-employees found him dead at about 3:30 P.M. on October 8, 1954. It is stipulated that he was murdered by Joseph Williams, a fellow employee of the respondent.
Before noon on October 8, 1954 the decedent received his weekly pay check. By about 11:30 A.M. this check was cashed. The decedent was seen by his foreman at 2:00 P.M. in the foundry building. Between 2:30 and 2:45 P.M. the decedent was smoking and chatting in the brick-shed with his co-employees De BeBerry, Valentine, and Williams (his murderer). At about 3:00 P.M. he was seen by another employee, Ross Smith, passing out of the foundry and into *79 the yard. Co-employee Stephen Turscik saw the decedent walk by him in the foundry, and a short time later saw him carried back on a stretcher. He estimated the time at 3:45 P.M., which must be the time the stretcher passed, as the evidence establishes that Crotty was murdered between 3:00 P.M. and 3:30 P.M.
On the basis of these facts the respondent contends that the accident did not arise out of the employment and that the decedent had taken himself out of the course of his employment by being in a place where he had no duties for an extended period of time. The petitioner uses the evidence of the decedent's having been seen in and out of the foundry as indicating that the decedent did not spend an extended period in the shed before his death, and that though he had no duties in the shed, he was not prohibited from being in it, and was probably taking a permitted rest period in the shelter of the shed.
The issues for determination are whether or not the death of James Crotty arose in the course of his employment, and whether his death arose out of his employment.
A very comprehensive definition of each of these phrases appears in Belyus v. Wilkinson, Gaddis & Co., 115 N.J.L. 43, 47 (Sup. Ct. 1935), an opinion by Justice Heher.
"* * * The words `out of' refer to the origin or cause of the accident; the words `in the course of' to the time, place and circumstances under which the accident takes place. An accident arises `in the course of' the employment when it occurs (a) within the period of employment; and (b) at a place where the employe may reasonably be; and (c) while he is reasonably fulfilling the duties of the employment, or doing something incidental to it. It arises `out of' the employment when the risk of such an occurrence is reasonably incident to the employment. Such a risk is one that grows out of or is connected with what a workman has to do in fulfilling his contract of service. And a risk may be incident to the employment when it is either an ordinary risk, directly connected therewith, or one extra-ordinary in character, indirectly connected with the employment because of its special nature. * * *"
Before attempting to correlate the facts in the case sub judice to this definition, it might be well to set forth *80 some of the principles of law which must influence this determination.
The petitioner carries the burden of establishing her claim by a preponderance of the probabilities and not merely possibilities. Certainty, however, is not required. Seiken v. Todd Dry Docks, Inc., 2 N.J. 469 (1949). This burden may be fulfilled by proof of either direct or of a circumstantial character which preponderates in favor of the tendered hypothesis by supporting a rational inference founded upon a comparative superiority of probabilities according to the common experience of mankind. Snoden v. Watchung Borough, 29 N.J. Super. 41, 45 (App. Div. 1953); Trusky v. Ford Motor Co., 19 N.J. Super. 100, 103 (App. Div. 1952). The Workmen's Compensation Act, R.S. 34:15-1 et seq., N.J.S.A., is remedial in nature and is to be liberally construed in favor of petitioners so as to accomplish the desired legislative ends. Bowen v. Olesky, 20 N.J. 520, 525 (1956); Spindler v. Universal Chain Corp., 11 N.J. 34 (1952); Sampson v. Thornton, 8 N.J. 415 (1952). Of particular significance is the following excerpt from Macko v. Herbert Hinchman & Son, 24 N.J. Super. 304, 307 (App. Div. 1953):
"The death of an employee from accident, before he has an opportunity to give his version of the accident and to tell why he was at the place where the misadventure happened, is apt to leave his dependents utterly unable to present evidence that would be considered sufficient in a case where death had not occurred, and the employee was able to testify. In recognition of that fact, courts in death cases generally are satisfied with very scanty circumstantial evidence that the accident arose out of, and in the course of, the employment. * * *"
The evidence in the case sub judice is not scanty, and the requirements set forth in the Belyus case, supra, with respect to "in the course of" employment are easily satisfied by the facts sub judice. The petitioner was murdered "within the period of the employment" as required by letter (a), for this may only mean during his working day. Letter (b) requires that the accident occur, "at a place where *81 the employe may reasonably be." The respondent argues in its brief that the phrase "in the course of the employment" refers to a man's presence at a place where his employment "requires" him to be. It further argues that Crotty never had any duties in the shed nor any personal or company business to explain his being there; that the shed was part of a department unconnected with that department in which Crotty was employed.
Human experience and the rules of law which grow out of it are contrary to such a contention. The requisite of letter (b) of the Belyus definition is not that the employee be "required" to be where the accident occurs, but merely at a place where he may reasonably be. It is obvious from the proofs that this shed was a not uncommon place for employees to gather, and that it took the place of a recreation-restroom which many employers supply for the comfort of their employees. In fact, the use of the shed as a place for employees to gather was apparently known by the employer, or at least its supervisory employees. It is also significant that Crotty's actual duties extended to sand bins immediately adjacent to the shed, and that he was permitted to come out of his basement stockroom and into the yard to smoke or just rest. Because Crotty's lips are sealed the proofs do not indicate the circumstances under which he came to the shed at the time of his murder, and there can be no presumption that his presence there was not reasonable. His being in the shed to smoke or rest would not be unreasonable. The proofs weigh much heavier in the direction of reasonableness rather than unreasonableness. Even if Crotty had no business in the shed his presence there under the circumstances would not remove him from the course of his employment. In a similar discussion of an employee injured in a place where he ought not to have been our former Supreme Court in Bolos v. Trenton, etc., Co., 102 N.J.L. 479 (Sup. Ct. 1926), affirmed Boles v. Trenton, etc., Co., 103 N.J.L. 483 (E. & A. 1927), said,
*82 "He may have been subject to discipline by the employer if any such strict rule existed (of which we find no evidence), but it cannot be said that he was not within the scope of his employment." (Quoted in Macko v. Herbert Hinchman & Son, supra, 24 N.J. Super., at page 309.)
Letter (c) of the aforesaid definition states that the accident must occur while the employee is reasonably fulfilling the duties of the employment, or doing something incidental to it. The evidence indicates that Crotty was seen by Ross Smith, a co-employee, passing out of the foundry and into the yard at about 3:00 P.M. and was seen by another employee, Stephen Turscik, walking by him in the foundry a short time before Crotty was carried back on the stretcher. The space of time, therefore, between which Crotty walked out of the foundry building and was murdered, must be less than one-half hour, for his body was discovered by 3:30 P.M. If he went out to the yard and sand bins and was lured or forced into the shed, he would not have deviated from the course of his employment. If he went out to the yard and to the shed on his own volition for the purpose of smoking, rest and or shelter, this would be doing something incidental to his employment and would not be a deviation under such cases as Waskevitz v. Clifton Paper Bd. Co., 7 N.J. Super. 1 (App. Div. 1950), and the authorities cited therein. The court is therefore satisfied that Crotty's murder occurred "in the course of" his employment.
The phrase "out of the employment" is somewhat more difficult of interpretation and application. The facts of this case remove it from the area of assaults arising out of personal animosity between two employees. There is present in the case sub judice the murder of an employee by a fellow employee, with a stipulation by the parties that the murder was committed to rob the victim of his weekly wages.
In Cole v. I. Lewis Cigar Mfg. Co., 3 N.J. 9 (1949), the decedent was a night watchman who was assaulted and robbed of his wallet. The evidence, however, permitted a reasonable inference that the assailant intended to rob the *83 factory as well. The employer relied on Walther v. American Paper Co., 89 N.J.L. 732 (E. & A. 1916), wherein a similar robbery of a night watchman occurred. There was a stipulation in the Walther case, however, that the robbery was intended to be of the particular watchman and not his employer. Chief Justice Vanderbilt in his Cole opinion agreed with the Appellate Division that because of the stipulation in the Walther case, the cases were distinguishable. He then made it quite evident that the Walther case could not and should no longer be the prevailing law, even where the assailant's only purpose was to rob the co-employee. He stated 3 N.J., at page 16,
"* * * the fact that Walther was murderd by a fellow employee intent on robbing him should not under the doctrine of the Sanders case have barred a recovery. Nor must it be overlooked that the Walther case was an early decision under the Workmen's Compensation Act, handed down at a time when the act was still being strictly construed here and elsewhere. * * *"
The Sanders' doctrine referred to by the Chief Justice is developed in the Cole case, supra, 3 N.J., at page 15, as follows:
"In Sanders v. Jarka Corp., 1 N.J. 36, 40 (1948), which was a case of a truck driver who while attempting to obtain information from the driver of another truck that had collided with him, was assaulted by the other driver's helper, Mr. Justice Wachenfeld, speaking for this court, said:
`The injuries need not have been foreseen, but it suffices if they flowed as a rational consequence from a risk connected with the employment.'
Holding that `employment as a cause of the injuries sustained has been emphasized as a basis of recovery,' he cited with approval Giracelli v. Franklin Cleaners & Dyers, Inc., 132 N.J.L. 590 (Sup. Ct. 1945), where compensation was allowed a female employee required to work alone in a dry cleaning establishment, who suffered injury through rape by a customer. Especially pertinent here are the excerpts from the Ciracelli decision which were quoted in approving it in the Sanders case:
`"And a consideration of human behavior as we find it impels us to think that the experience visited on the petitioner in this case was a risk, attaching to the employment. * * * But for the *84 conditions surrounding the petitioner's employment the accident would not have happened."'"
Dean Larson in his oft-cited text, 1 Law of Workmen's Compensation, p. 136, § 11.16(c), uses Sanders v. Jarka Corporation, supra, in the development of what he terms the "but-for or positional doctrine." Stated simply, the doctrine may be applied as follows: But for the employment, the accident would not have happened.
The New Jersey cases cited by the parties in the case sub judice, as well as those already cited by this court, appear to add something to this statement to make it less general, viz, but for the conditions surrounding the petitioner's employment the accident would not have happened. It is within this frame of reference that this court feels the case sub judice must be decided, lest it usurp the function of our appellate tribunals.
This brings us to a comparison of the instant case with three fairly recent New Jersey assault cases where petitioners were awarded compensation, to wit, Giracelli v. Franklin Cleaners & Dyers Inc., 132 N.J.L. 590 (Sup. Ct. 1945); Gargiulo v. Gargiulo, 13 N.J. 8 (1952), and Howard v. Harwood's Restaurant Co., 40 N.J. Super. 564 (Cty. Ct. 1956), affirmed 43 N.J. Super. 301 (App. Div. 1957).
In the Giracelli case, the petitioner, while working alone in a cleaning establishment, was raped by a customer who followed her into a back room where garments were kept. In the Gargiulo case the petitioner, a store clerk, was returning from the yard to the store after burning trash. As he was walking toward the rear entrance of the store he was injured by an arrow shot by a boy without any warning except the cry, "Look out," before he was struck. In the Giracelli case, the court, 123 N.J.L., at page 594 reasoned that,
"* * * The petitioner's presence in the rear room was a necessary part of her employment and in the prevailing circumstances she was exposed to the attack that took place. It was not something that happened to her as a member of the general public. * * *"
*85 In the Gargiulo case the reasoning of the Supreme Court is expressed in the following, 13 N.J., at page 13:
"* * * It was a necessary antecedent in that the injured employee would not have been where he was had he not been engaged in his appointed task. It brought him unwittingly into the line of fire of the arrow, where he would not have been except for his employment. * * *"
In Howard v. Harwood's Restaurant Co., supra, the petitioner was viciously beaten by an insane co-employee during the course of her employment. The Appellate Division, in a per curiam opinion, 43 N.J. Super. 301, 302, affirmed the judgment of the Essex County Court for the reasons stated in its opinion, and went on to say the following:
"In addition to the matters stated there, it may be noted that the ordinary employer has the right of delectus personae. He selects and engages the employees; * * *. In the usual case, the employee has no choice as to his fellow employees or the nature or proximity of their contact with him. * * * Thus it may be said that a workman's fellow employees with all their idiosyncrasies and weaknesses, physical and mental, are a condition of the employment.
If an employee becomes ill while operating a machine or a delivery truck in the course of his employment, and as a result loses control thereof and injures a fellow employee working alongside of him, or acting as helper on the truck, can there be any doubt about the compensability of resulting injuries? If the same employee becomes sick mentally, suffers a sudden, unexplainable, insane delusion over which he has no control, and injures his fellow worker because of a compulsive impulse produced by the insanity, there would appear to be no rational basis for distinguishing between the two claims from the standpoint of compensability. Insanity is a condition which must be recognized as an incident of everyday life; it can erupt into irrational and purposeless violence at any time during the working day. An employee who is injured in the course of his work by the insane act of a fellow worker, in our judgment, clearly sustains an injury which arises out of the employment."
Some of the reasoning of the County Court which was adopted by the Appellate Division appears on page 572 of 40 N.J. Super. following a discussion almost identical to *86 that above quoted. "The basis of this view is akin to the `positional or but-for' doctrine which appears, in large measure, to have been adopted in New Jersey."
The brick shed in which respondent's employees gathered, or at least used for purposes not inconsistent with their employment, created the perfect place for Crotty's assault. It was available, evidently unlocked and unguarded, and offered the assailant shelter from detection. If Crotty were walking from the foundry to the sand bin and was accosted and forced into the shed, then the Gargiulo case would be satisfied. But in any event the employment not only presented the place for the assault, but the time for the murderer to act, and the spoils for him to take. But even more important than attempting to draw comparisons between the factual elements of the case sub judice and Giracelli and Gargiulo, is to examine the ramifications of the Howard case. The Howard case means that an injury during the course of employment caused by an insane act of a co-employee is to be considered as a risk incidental to the employment, and hence arising out of it. It would be intriguing if Mrs. Crotty's recovery were to be dependent upon the state of the murderer's mental imbalance. The benevolent purposes of our Workmen's Compensation Act can certainly not be subserved thereby. There could be no rational basis, from the standpoint of compensability, for distinguishing between a vicious assault resulting in near death by a co-employee deemed insane, and a vicious assault resulting in death by a co-employee deemed a murderer. The deviation from "normal" behavior denominated "insanity" has no greater right to preemption as a condition which must be recognized as an incident of everyday life, than the deviation from "normal" behavior denominated "criminality." And that, if there is a distinction between the two. For "criminality," just as "insanity," "can erupt into irrational and purposeless violence at any time during the working day." An employee who is injured in the *87 course of his work by the anti-social, viz., criminal act of a fellow employee, clearly sustains an injury which arises out of the employment.
The decision of the Deputy Director is reversed and a judgment shall be entered in favor of the petitioner and against the respondent in the amount of $24.50 per week for the statutory 300 weeks, plus statutory funeral allowance in the sum of $250, the total recovery being $7,600.