49 N.J. Super. 60 (1958)
139 A.2d 126
LETITIA CROTTY, PETITIONER-RESPONDENT,
v.
DRIVER HARRIS CO., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 18, 1957.
Decided February 17, 1958.
*63 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Edward B. Meredith argued the cause for appellant.
Mr. Thomas J. Brett argued the cause for respondent (Messrs. O'Brien, Brett & O'Brien, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Respondent company appeals from a County Court judgment reversing the dismissal by the deputy director in the Workmen's Compensation Division of petitioner's dependency claim petition and awarding her compensation for the death of her husband, James Crotty. Crotty was murdered by his co-worker Williams on the afternoon of October 8, 1954 in what is described as the brick shed located on the company's premises. The motive was robbery, Williams having taken from his victim the proceeds of his pay check received and cashed earlier that day. Williams was convicted of murder and sentenced to life imprisonment.

I.
Appellant attacks the allowance of an award on the ground that the County Court was "conclusively bound by the stipulations of fact and may not base a judgment upon conjecture or inference directly in conflict with the agreed facts." This is a misconception of what happened before the deputy director. The only stipulated facts were the murder, the motive for the crime, the conviction, and the *64 physical layout of the premises as shown on a plan and survey of the Driver Harris foundry. Beyond this the parties, by their counsel, merely agreed that a lengthy trial be avoided by submitting to the deputy director a succinct statement of what their respective witnesses would have testified to if called. The facts and the reasonable inferences to be drawn therefrom were thus presented for determination as if the case had been fully tried.
The stipulated testimony discloses the following undisputed facts. Crotty, then 71 years old, was employed at the Driver Harris foundry as stock clerk. His duties were confined to the supplies in the stock room located in the basement of the foundry and any materials in the yard belonging to his department. He had no immediate duties connected with or requiring him to go into the brick shed which adjoined the foundry, the walking distance from foundry door to shed being 50 feet on a right-angle course. However, his work did involve checking the sand storage bins located next to the shed and which were under his jurisdiction.
Crotty was allowed, under company policy, "to leave the stock room and go out for air or to take a break * * * when he felt like it." Three fellow employees would have testified that Crotty "did a lot of wandering in and about the foundry on occasions, that he wasn't confined strictly to his tool crib or stock room." The foundry manager said he personally had no knowledge of decedent going into the shed. The foundry foreman, one of Crotty's supervisors, would have testified that he did not know that Crotty was in the shed. And the shop steward would have said that he personally had no knowledge of why Crotty went into the brick shed and never knew of his using that place.
Crotty had cashed his pay check in a tavern at 11:30 that morning. Williams and one Valentine were seen in the shed between 12:10 and 12:30 drinking wine, but Crotty was not with them. The foreman saw Crotty in the foundry at 2 P.M. According to Valentine and another employee DeBerry, they, together with Crotty and Williams, were *65 in the shed between 2:30 and 2:45 P.M. smoking and talking. They then left the shed and did not see Crotty again until between 3:30 and 3:40 P.M., when they found him lying on the floor of the shed, bleeding and with his head smashed in.
Two co-employees, Smith and Turscik, saw Crotty alive after 2:45 P.M. Smith saw him leave the foundry and go out into the yard at about 3 P.M. Turscik saw Crotty walk by him in the foundry, and a short time later  about 3:45 P.M.  saw him carried back into the foundry on a stretcher. Several employees saw Williams sweeping the foundry floor and yard around 3 P.M., and DeBerry and Valentine both noticed him coming from the shed at about 3:30 P.M. Shortly after that they found Crotty's body there. Williams was seen washing up in the shower room sometime between 3:45 and 4 P.M.
Such was the testimony that would have been adduced by petitioner's witnesses as to the events of that afternoon. Appellant stipulated that its testimony would be in substantial agreement, with the addition that were Valentine and DeBerry to testify as they did at the criminal trial of Williams, they would have said that when they were in the brick shed with Williams and Crotty (i.e., between 2:30 and 2:45 P.M.) they were "goofing off"  loafing; that they had seen Crotty there on one or more occasions that afternoon, smoking and talking to the others, and that at one time he was "sitting or stretched out on the pile of bricks in there telling stories."

II.
In his oral opinion the deputy director, after repeating the stipulated testimony almost verbatim, found that Crotty entered the shed sometime between 2:30 and 3 P.M. and remained there until he was murdered. He stated it was "pure speculation" to say that decedent ever left the shed during that period, so that it could not be said he went there just for a smoke. He specifically found that Crotty *66 remained in the shed "for an extended period of time"; that decedent, "for all intents and purposes, deviated from the sphere of his employment and, in essence, abandoned his employment"; and that "this was not a slight or even casual departure * * * nor is it a momentary or impulsive departure from the course of his employment so as to spell out liability * * *." Accordingly, he denied compensation and dismissed the claim petition.
The County Court judge, however, took note of testimony which the deputy director had either overlooked or ignored, namely, that Crotty had been seen in the foundry at about 3 P.M. In determining that Crotty's death arose out of and in the course of his employment, Crotty v. Driver-Harris Co., 45 N.J. Super. 75 (1957), the County Court quoted and applied the comprehensive definition given by Justice Heher in Belyus v. Wilkinson, Gaddis & Co., 115 N.J.L. 43, 47 (Sup. Ct. 1935), affirmed per curiam 116 N.J.L. 92 (E. & A. 1936):
"* * * The words `out of' refer to the origin or cause of the accident; the words `in the course of' to the time, place and circumstances under which the accident takes place. An accident arises `in the course of' the employment when it occurs (a) within the period of the employment; and (b) at a place where the employe may reasonably be; and (c) while he is reasonably fulfilling the duties of the employment, or doing something incidental to it. It arises `out of' the employment when the risk of such an occurrence is reasonably incident to the employment. Such a risk is one that grows out of or is connected with what a workman has to do in fulfilling his contract of service. And a risk may be incident to the employment when it is either an ordinary risk, directly connected therewith, or one extraordinary in character, indirectly connected with the employment because of its special nature. * * *"
The County Court was satisfied that Crotty's murder occurred "in the course of" his employment. It also found it arose "out of the employment," adopting the "but-for" or "positional" doctrine and citing Giracelli v. Franklin Cleaners & Dyers, Inc., 132 N.J.L. 590 (Sup. Ct. 1945); Sanders v. Jarka Corp., 1 N.J. 36 (1948); Cole v. I. Lewis Cigar Mfg. Co., 3 N.J. 9 (1949); Gargiulo v. Gargiulo, 13 N.J. *67 8 (1953), affirming 24 N.J. Super. 129 (App. Div. 1952); Howard v. Harwood's Restaurant Co., 40 N.J. Super. 564 (Cty. Ct. 1956), affirmed 43 N.J. Super. 301 (App. Div. 1957), since affirmed 25 N.J. 72 (1957).

III.
We observe preliminarily that the guiding principle on appellate review of compensation cases is that we must give great weight to the judgment of the County Court. Although this court has the power to make independent findings of fact, we do not exercise that power unless our study of the record indicates that the interests of justice plainly call for reversal. Augustin v. Bank Building and Equipment Corp., 44 N.J. Super. 242, 243 (App. Div. 1957); Martin v. Snuffy's Steak House, 46 N.J. Super. 425, 431 (App. Div. 1957). But, as was said in Ricciardi v. Marcalus Mfg. Co., 47 N.J. Super. 90, 101 (App. Div. 1957), certification granted 25 N.J. 405 (1957), such a conclusion ordinarily is not tenable where there is substantial evidence to support the findings underlying the County Court judgment.
We do not have here the usual case where the deputy director saw and heard the witnesses, so that the question of credibility is not posed. Further, the deputy director's conclusion that Crotty never left the shed is patently erroneous. The inferences he drew were all based on this significant error and are therefore defective. Contrary to petitioner's argument, the County Court's findings did not depart from what is erroneously described by counsel as stipulated facts, but are all based on legitimate inferences from the stipulated testimony.
As an example of appellant's erroneous characterization of the record, it is asserted that it was stipulated that the only reason for Crotty's presence in the shed was to loaf or "goof off," and that he was "sitting or stretched out on a pile of bricks in there telling stories." But that is not the case; all we have is that Valentine and DeBerry would have so *68 alleged had they testified as they did at the criminal trial. Such testimony might, perhaps, have supported an inference that the two assertions were true. What appellant's counsel actually said was that if these two witnesses remained consistent in their testimony, they would have said that Crotty "at one time was sitting or stretched out on the pile of bricks in there telling stories." It is to be noted that they do not say specifically when this occurred. It is just as inferable that Crotty was sitting or stretched out on the bricks telling stories at some time prior to the mentioned 2:30-2:45 P.M. period.
As to "goofing off," this is likewise a conclusion premised on appellant's proffered testimony. The testimony stipulated by petitioner was only that Crotty and his shed companions were smoking and chatting when they were in the shed from 2:30 to 2:45 P.M. The characterization of this activity at the criminal trial as loafing or "goofing off" does not conclusively establish that Crotty's presence in the shed during the 15-minute period, or perhaps afterward, was only to "goof off." And it may fairly be said that "goofing off" is merely a form of expression. At best, "goofing off," to men like Valentine and DeBerry, presumably much younger men than decedent, may have been nothing more to a septuagenarian like Crotty than a needed rest or a bit of relaxation. What is a permitted "break" and what constitutes "goofing off" depends also on an individual's work attitude. At any rate, the characterization of Crotty's presence in the shed as loafing certainly is not a conclusion requiring a finding that what he was doing was such a departure from his normal work functioning as to constitute an abandonment. Moreover, even if it does, it refers only to his presence in the shed from 2:30 to 2:45 P.M.
The County Court found as a fact that Crotty left the shed and did not return until some time after 3 P.M. There is no direct proof as to the reason for his presence in the shed after that time. It could reasonably be inferred from Crotty's permitted work habits, mentioned above, that he had gone to the shed to rest or smoke.

*69 IV.
A fair reading of the stipulated testimony establishes that Crotty was in the brick shed between 2:30 and 2:45 P.M. Two witnesses place him in the foundry at 3 P.M., or possibly later. Williams murdered him half an hour or less following. The question is whether Crotty's presence in the shed at the moment of murder constituted an abandonment of his employment so that his injury might not reasonably be said to have occurred "in the course of his employment."
An accident arises "in the course of" employment when it occurs (a) within the period of the employment and (b) at a place where the employee may reasonably be, and (c) while he is reasonably fulfilling the duties of the employment, or doing something incidental thereto. Belyus v. Wilkinson, Gaddis & Co., above, 115 N.J.L., at page 47. Requirements (a) and (b) obviously were satisfied. In our view, petitioner met requirement (c). Admittedly, Crotty had no duties to perform in the brick shed, although he did have jurisdiction over and checked the sand bins alongside that structure. He was allowed, under his employer's policy, to leave the stock room and go out for air or "to take a break" whenever he felt like it, and that he did so was known to the company.
Crotty would not have taken himself out of the employment had he merely gone into the yard for a smoke or a rest. Nor did he take himself out of the employment by going into the shed to do so. The shed was only 50 feet from the foundry door, out in the yard, and was not "out of bounds" under any company rule, regulation or directive. In view of the relatively short length of time spent in the shed, decedent's age and the fact that the sand bins were located right next to the shed, Crotty's going into the shed, if only to rest and smoke, was not so substantial a departure from his employment as to preclude recovery as a matter of law.
It is now well settled that an employee need not actually be engaged in the work of his employment to suffer a compensable injury. Under the Belyus doctrine, Crotty's *70 death occurred while he was doing what a man so employed might reasonably do within a time during which he was employed, and at a place where he might reasonably be at that time. Macko v. Herbert Hinchman & Son, 24 N.J. Super. 304, 308-309 (App. Div. 1953). Employees who, within the time and place of their employment, engage in acts which minister to personal comfort or needs do not thereby leave the course of their employment unless the extent of the departure is so great that an intent to abandon the job temporarily may be inferred. 1 Larson, Law of Workmen's Compensation, § 21.00, p. 297 (1952, and 1957 cum. supp.); Waskevitz v. Clifton Paper Board Co., 7 N.J. Super. 1 (App. Div. 1950); Van Note v. Combs, 24 N.J. Super. 529 (App. Div. 1953). Justice Jacobs, speaking for the court in Secor v. Penn Service Garage, 19 N.J. 315, 321 (1955), said:
"Despite occasional suggestions to the contrary it is now well settled in our State and elsewhere that an employee is not deprived of the benefits of the Compensation Act simply because he was not actually working when the accident occurred. See Buerkle v. United Parcel Service, 26 N.J. Super. 404, 407 (App. Div. 1953). He may have stopped work to have a smoke, or to get some fresh air, or to use the telephone, or to satisfy other human needs incidental to his being at his place of employment; it is clear that injuries which occur during such minor deviations are generally sufficiently related to the employment to call for compensation. See Waskevitz v. Clifton Paper Board Co., 7 N.J. Super. 1, 3 (App. Div. 1950); Horovitz, Injury and Death Under Workmen's Compensation Laws (1944), 112; Larson, supra, 297. Similarly employees may stop work to satisfy their interest in a passing parade or in a strange object or their curiosity generally; here Larson (supra, 369) suggests that so long as the deviation is minor it should be disregarded. As he put it:
`Along with all the other frailties of the average man  his carelessness, his prankishness, his tobacco habit, his cola habit, his inclination to rest once in a while and chat with his neighbor  there must also be expected one more: his natural human proclivity for sticking his head in mysterious openings, putting his fingers in front of fan blades, and pulling wires and pins on strange mechanical objects which he finds.'"
And see Larson, op cit., §§ 21.40, 21.70, 21.71, pp. 308, 316, for a general discussion of the law in smoking and resting cases.
*71 We do not know precisely what happened when Crotty left the foundry sometime after 3 P.M. It may be, as the County Court judge suggested, that he was on his way to the sand bins and was forced into the shed by Williams. Or, as is more possible and plausible, he entered the shed of his own volition to smoke, to rest, or for shelter. We hold that his presence in the shed did not, as a matter of law, constitute an abandonment of his employment. Here we might note that in cases where there are no witnesses to an employee's death, courts generally are satisfied with scant circumstantial evidence that the accident arose out of and in the course of the employment. Macko v. Herbert Hinchman & Son, above, 24 N.J. Super. at pages 307-308, where the New Jersey authorities are set out at length.

V.
We next deal with the question whether the accident arose "out of" the employment. This relates to the existence of a causal connection between the injury and the employment. See Belyus v. Wilkinson, Gaddis & Co., above, 115 N.J.L. at page 47; Larson, op cit., § 6.10, p. 42.
Williams murdered Crotty to rob him of his pay. Generally, criminal assaults by fellow employees or even by third parties are compensable in this State. Gargano v. Essex County News Co., 129 N.J.L. 369 (Sup. Ct. 1943); Giracelli v. Franklin Cleaners & Dyers, Inc., above, 132 N.J.L. 590 (Sup. Ct. 1945); Sanders v. Jarka Corp., above, 1 N.J. 36 (1948); Cole v. I. Lewis Cigar Mfg. Co., above, 3 N.J. 9 (1949); Gargiulo v. Gargiulo, above, 24 N.J. Super. 129 (App. Div. 1952), affirmed 13 N.J. 8 (1953); Kelly v. Dempsey, 13 N.J. 308 (1953); Cierpial v. Ford Motor Co., 16 N.J. 561 (1954), reversing 31 N.J. Super. 489 (App. Div. 1954); Howard v. Harwood's Restaurant Co., 40 N.J. Super. 564 (Cty. Ct. 1956); 43 N.J. Super. 301 (App. Div. 1957), affirmed 25 N.J. 72 (1957). An exception to this rule is the case of an assault due to personal animosity. Giles v. W.E. Beverage Co., 133 N.J.L. 137 *72 (Sup Ct. 1945), affirmed 134 N.J.L. 234 (E. & A. 1946); Bowen v. Olesky, 20 N.J. 520 (1956). The employment need not be the sole or proximate cause of the injury; it is sufficient if it is a necessary factor leading to the accident. Cierpial v. Ford Motor Co., above, 16 N.J. at page 566. As was said in Gargiulo v. Gargiulo, above, 13 N.J. at page 12:
"There must be a causal relation between the injury and the conditions under which the work was required to be done. But foreseeability of the injury is not the test. It need not have been expected. Rather, it suffices if the injury has its origin in a risk connected with the employment and flows from that source as a rational consequence. * * *"
While the employment may not have been the proximate cause of the fatal assault on Crotty, it assuredly was a contributing factor, providing the murderer with the place and opportunity to assault and rob his victim. But for the employment, the assault and death would not have occurred when it did. The assault in this case was related to the employment in much the same sense as the assaults in the cases cited above where, in each instance, the employment brought the employee into contact with a vicious, criminal or hot-tempered person.
The "positional" or "but-for" test has been adopted in this jurisdiction. Sanders v. Jarka Corp., above, 1 N.J. at page 41; Gargiulo v. Gargiulo, above, 13 N.J. at page 13; Howard v. Harwood's Restaurant Co., above, 25 N.J. at page 82 et seq., where the doctrine is fully explored by Justice Burling. See, also, Larson, "Legal Aspects of Causation in Workmen's Compensation," 8 Rutgers L. Rev. 423, 427. As observed in the Howard cases:
"* * * `But-for' connotes a standard of reasonable probability. Thus stated, the question is whether it is more probably true than not that the injury would have occurred during the time and place of employment rather than elsewhere. * * *" (25 N.J. at page 83) *73 The Howard rationale is that all that is required is that the risk be either associated with the employment or a "neutral" risk, and not one personal to the employee.
What happened to Crotty was not attributable to personal animosity on the part of Williams, whose only motive was robbery. The fact that it was Crotty's money and not the company's he was after merely takes the risk out of the class of those distinctly related to the employment (see Larson, op cit., § 7.10, p. 48), and puts it in the category of so-called "neutral" risks (Ibid., § 7.30, p. 49). Under the "but-for" test, assaults by co-workers are compensable as long as they are not motivated by personal vengeance stemming from contact with the employee outside of the employment. Howard v. Harwood's Restaurant Co., above, 25 N.J. at page 84; Larson, op cit., § 11.16(c), 11.21, pp. 135, 136.
We consider the facts of this case as meeting the standard of reasonable probability required for application of the "but-for" test, i.e., it is more probably true than not that the attack and death would have occurred during the time and place of Crotty's employment rather than elsewhere. This limitation on the "but-for" test is not related to the probabilities of the injury occurring qua injury, but to whether it is just as probable that the injury would have occurred somewhere else as at the time and place it did. The standard is concerned only with the physical facts of causation. Thus, in Henderson v. Celanese Corp., 16 N.J. 208 (1954), relief was denied an employee who, during an epileptic seizure, fell and struck his head against the concrete floor of the factory. The time and place of employment, as a purely physical matter, were causally immaterial. The workman would have sustained the same injury had he fallen anywhere; his presence on the job was physically irrelevant. Contrast Reynolds v. Passaic Valley Sewerage Commrs., 130 N.J.L. 437 (Sup. Ct. 1943), affirmed 131 N.J.L. 327 (E. & A. 1944), where an employee during an epileptic seizure, fell against the hot stove in a shanty where he had sought relief. As the court in the Howard *74 case said, it could properly be said in Reynolds that it was more probably true than not that the injury would not have occurred under the normal circumstances of everyday life which exist outside of the employment. See Rodes, "Workmen's Compensation," 10 Rutgers L. Rev. 140, 142-144. And in the Gargiulo case the place of employment  petitioner's being in the rear yard at the time an arrow shot by a boy in the direction of the employer's property struck him in the eye  was causally significant. But for his presence there at the particular time, he would not have been hit.
We hold that Crotty's death was the result of an accident arising out of and in the course of his employment, and the judgment of the County Court is therefore affirmed.