64 N.J. Super. 561 (1960)
166 A.2d 827
RUTH WILLIAMS, PETITIONER-APPELLANT,
v.
CORBY'S ENTERPRISE LAUNDRY, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 5, 1960.
Decided December 28, 1960.
*563 Before Judges CONFORD, FREUND and KILKENNY.
Mr. Herman M. Wilson argued the cause for petitioner-appellant.
Mr. Isidor Kalisch argued the cause for respondent-respondent.
The opinion of the court was delivered by FREUND, J.A.D.
The issue before us, in this workmen's compensation action by a widow claiming dependency benefits, is whether her husband's death, concededly occurring in the course of his working hours, arose out of his *564 employment. The deputy director decided in petitioner's favor, but the County Court, on hearing de novo based on the record below, dismissed the petition on the ground that decedent had died as a result of a non-work-connected cerebral hemorrhage, induced solely by an antecedent arteriosclerotic condition. The instant appeal followed.
Decedent, John Williams, was employed by respondent as a night watchman in its Summit plant on the 11 P.M. to 7 A.M. shift. On the morning of December 14, 1957 his body was discovered by a fellow employee. The 63-year-old Williams was stretched out on his back on the floor of the plant, his blood-stained head resting on a pile of laundry nets, his right hand still gripping a metal stanchion. About 30 to 40 feet from where Williams lay, in a machine-laden area of the 100 by 200 foot plant, were his cap and time clock, resting close to another spatter of blood. The path between these two points was clearly marked by a trail of blood droplets.
At first it was thought that Williams was the victim of foul play; such a theory was in fact posited in the widow's petition but was discarded before the Division. Instead, two factual contentions, set out in detail below, were put forth by petitioner, predicated on the physical facts and circumstances and on the following relevant autopsy findings by Dr. Horre, the County Physician:

"Head
Scalp  Laceration 2" in length  right occipital area. Hemotoma [sic] of the right side
Skull  Small stellate fracture  right occipital area
Dura-mater  Tear in posterior middle fosa
Brain  Left side cerebral hemorrhage, left basel [sic] ganglion. Marked ateriocerebral [sic] sclerosis
Spinal cord  normal"
As expounded by her medical witness, Dr. Lieb, petitioner's alternative hypotheses were: (1) that decedent had slipped on a sloping portion of the laundry floor, or tripped over one of the machines, had struck the right rear of his head on *565 one of these protuberances, causing the laceration and fracture, and then by a reaction described as "contrecoup," a type of rebound process, had ruptured the blood vessels on the left side of his head, producing his hemorrhage; and (2) that decedent had suffered a hemorrhage, had fallen to the ground, striking his head, as he fell, on one of the sharp protuberances, and had eventually died from the combination of skull fracture and hemorrhage.
Dr. Lieb practically abandoned his first theory when, on cross-examination, he was asked to take into account the irregular manner in which decedent had punched his time clock for several hours prior to his demise. The irregularities were described by the County Court in its decision:
"His duties called for him to record at 11 o'clock on his time clock the eight stations referred to and to continue the procedure hourly thereafter. The recording paper removed from his clock and admitted in evidence shows that at 11 o'clock the decedent recorded at stations 1, 2 and 3, omitted station 4 and recorded stations 5, 6, 7 and 8. At 12 o'clock he recorded 1, 2, 3, omitted 4, recorded 5 twice and then 6, 7, and 8. At one o'clock he omitted 1 and 2, recorded 3, 4, 5 and 6 and omitted 7 and 8. No further recordings were made. The work records of the decedent up to the night in question had been clear and indicated no prior difficulty in this particular area of his work."
Dr. Lieb admitted that this operative inconsistency indicated that decedent was having cerebral difficulty prior to his fall. Dr. Horre, called to the stand by respondent, corroborated Dr. Lieb's view that decedent's trouble in punching his time clock accurately was a premonitory sign of cerebral impairment. Dr. Horre further criticized petitioner's "contrecoup" theory by pointing out that the hemorrhage occurred in the basal nucleus, inside decedent's brain, and that if it had been the result of trauma  through a contrecoup mechanism  there would have been a subdural or epidural hemorrhage at the site of the lesion.
We agree with respondent that petitioner must stand or fall on her second hypothesis. The overwhelming evidence of prior cerebral impairment, unconnected with a work injury, *566 makes it incumbent upon petitioner to demonstrate, with reasonable probability, Lohndorf v. Peper Bros. Paint Co., 134 N.J.L. 156, 159 (Sup. Ct. 1946), affirmed 135 N.J.L. 352 (E. & A. 1947), that not only was decedent's skull fracture at least a contributing factor to his death, but that the fracture was produced by contact with an object other than the concrete floor of the plant. The latter requirement is dictated by the holding in Henderson v. Celanese Corp., 16 N.J. 208, 214 (1954), a four-to-three decision, that there is no justification for classifying a level, customary, concrete floor as a hazard or special condition of employment. The Supreme Court reasoned that it is just as probable that the same injuries would have ensued had the petitioner suffered his idiopathic fall at home or on the street. See Howard v. Harwood's Restaurant Co., 25 N.J. 72, 83 (1957); 1 Larson, Workmen's Compensation, § 12.14, p. 162. There is no doubt, of course, that a showing that decedent probably struck his head on one of the metal pipes or machines or on the metal drain cover adjacent to the point of his initial fall would sufficiently relate his skull fracture to a "condition[s] attached to the place of employment." Reynolds v. Passaic Valley Sewerage Com'rs, 130 N.J.L. 437, 443 (Sup. Ct. 1943), affirmed 131 N.J.L. 327 (E. & A. 1944).
Our resolution of whether petitioner is entitled to compensation must evolve in the context of several basic principles. It is clear that a fatal injury suffered in the course of employment but produced solely by natural forces wholly unrelated to the conditions or risks of the employment is not compensable. Snoden v. Watchung Borough, 29 N.J. Super. 41, 45 (App. Div. 1953), affirmed 15 N.J. 376 (1954). Furthermore, the burden of proving that an injury is work-attached is generally on the party claiming compensation. Green v. Simpson & Brown Construction Co., 14 N.J. 66, 69 (1953).
However, in striving for a fair allocation of evidentiary responsibility, our law has burdened the employer with *567 the duty of demonstrating that an apparently work-connected injury was actually the sole result of the employee's general physical condition. Atchinson v. Colgate & Co., 3 N.J. Misc. 451, 452 (Sup. Ct.), affirmed 102 N.J.L. 425 (E. & A. 1925); Joy v. Florence Pipe Foundry Co., 64 N.J. Super. 13, 20 (App. Div. 1960). Respondent claims to have discharged that burden, urging that its proofs sufficiently show that decedent's death resulted exclusively from a non-occupational cerebral hemorrhage; it maintains that in prior unexplained death cases where compensation was awarded, a "natural" cause of death was not, as here, discovered.
Respondent has asked in its brief and on oral argument that in weighing the evidence we take notice of Dr. Lieb's alleged status as a frequent petitioner's witness and contrast him with Dr. Horre, an assertedly disinterested witness whose findings were made in his official capacity as county physician. While we have no doubt that the demonstrated interest or bias of a witness is a relevant consideration in evaluating his testimony, cf. State v. Spruill, 16 N.J. 73 (1954), we will not discredit the opinions of a medical expert simply because his views have often been elicited by one class of compensation litigants, whether petitioners or respondents. We have repeated time and again that the judicial process, embracing, of course, the administrative hearing, is first and foremost an exercise in truth-seeking. See Gilligan v. International Paper Co., 24 N.J. 230, 239 (1957). In pursuit of the truth, all of the pertinent avenues must be explored. We cannot ignore the fact that medical questions, like legal dilemmas, are susceptible to divergent resolution. We have given the views of each of the medical witnesses such weight as it seems to us they deserve in the light of all the facts and circumstances and the supporting reasoning advanced.
We have carefully studied the entire record in accordance with the responsibility allocated to us by Russo v. United States Trucking Corp., 26 N.J. 430 (1958), *568 and Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445 (1958). We deem especially important the now-settled principle that where there has been an unwitnessed fatal mishap occurring within the time and space limits of the employment, the claimant's standard of proof will be considerably relaxed. Macko v. Herbert Hinchman & Son, 24 N.J. Super. 304, 307 (App. Div. 1953); Greenfarb v. Arre, 62 N.J. Super. 420, 431 (App. Div.), certification denied 33 N.J. 454 (1960); see Annotation, 120 A.L.R. 684 (1939); 1 Larson, supra, § 10.32, pp. 101-106. To the extent that Nardone v. Public Service Electric & Gas Co., 113 N.J.L. 540 (Sup. Ct. 1934), is inconsistent with this principle, we agree with the court in Macko that the Nardone philosophy has been substantially, if not completely, eroded by subsequent decisions. See, e.g., Olivera v. Hatco Chemical Co., 55 N.J. Super. 336 (App. Div.), certification denied 30 N.J. 557 (1959). Relaxation of the evidentiary burden not only accords with the salutary purposes of compensation legislation, see Gargiulo v. Gargiulo, 13 N.J. 8, 13 (1953), but also constitutes warranted recognition of the fact that one cannot be expected, in such a situation, to do more than present the more believable of the competing hypotheses.
Petitioner had only to demonstrate that a work-connected injury was one of the contributing factors to her husband's death, not that it was the sole or the greater cause. Dudley v. Victor Lynn Lines, Inc., 32 N.J. 479, 491-492 (1960). Dr. Lieb testified on her behalf that a fall causing a stellate fracture of the type incurred by decedent "probably would aggravate" a prior cerebral hemorrhage. His conclusion as to the dual cause of Williams' death was based largely, he said, on the undisputed autopsy findings of Dr. Horre.
Dr. Horre, on the other hand, was somewhat less than persuasive in his effort to explain away his notation on the autopsy report that the "cause of death" was "cerebral hemorrhage  fracture of the skull." He insisted on the *569 witness stand that the fractured skull played no contributing part in the death of Williams; with respect to the notation, he said: "It was incidental in finding the fracture when I did the autopsy."
We consider petitioner's proof to be the more convincing. We do not find it necessary to speculate on the reasons for Dr. Horre's apparent change of view subsequent to the time he filled out the autopsy report. The laceration and fracture, with the accompanying loss of blood (admitted by Dr. Horre to have resulted solely from these external injuries), the fact that decedent had sufficient vitality after the trauma to be able to move from the point of initial impact to the area where he continued to bleed profusely and eventually expired  all preponderate in favor of petitioner's theory that the fracture contributed to or accelerated the death of decedent.
The more persuasive inferences also coincide with petitioner's position that decedent sustained his fracture through contact with an object other than the concrete floor of respondent's plant. A stellate fracture is a "fracture with a central point of injury, from which radiate numerous fissures." Dorland's Medical Dictionary (23d ed. 1958), p. 532. Dr. Lieb stated unequivocally that such a fracture is more likely the result of trauma involving a protuberance or pointed surface as opposed to a flat surface. Dr. Horre's opinion was not substantially at variance. He testified that a stellate fracture "is not necessarily" due to contact with a sharp surface, but rather, it "[depends] on the indenture of puncture."
Examination, by means of photographs received in evidence, of the physical layout in the vicinity of Williams' first fall provides us with additional illumination. The blood-stained area consists of a passageway no more than four feet in width, bordered on two sides by large metal wringers; the square base of an adjacent tank is raised slightly above ground level. Several inches from the point at which decedent's hat was found, the concrete floor is *570 covered by a corrugated metal plate, about a foot wide and several feet long. Through a hole in the plate, from the floor below, protrudes a metal drain pipe, leveling off at several inches above the floor level and running two or three feet to another tank. The area immediately surrounding this pipe, including the corrugated plate, is spattered with heavy concentrations of dried blood.
While we shall never know the exact nature of decedent's fall, the confined area in which he fell, heavily congested with pipes and machinery, is of substantial probative value in attempting to reconstruct the event. Considering this factor, and also taking into account the autopsy finding of laceration (a tearing type of wound indicative of contact with a sharp or protruding object) and stellate fracture, we are of the opinion that petitioner has successfully established the probability of her thesis that the fracture was the result of contact of decedent's head with something other than the bare concrete floor.
We accordingly conclude that the judgment of the County Court must be reversed and the award of the deputy director reinstated.
So ordered.