76 N.J. Super. 20 (1962)
183 A.2d 717
ROSE WILSEY, PETITIONER-APPELLANT,
v.
JOHN REISINGER, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 9, 1962.
Decided August 3, 1962.
*21 Before Judges GOLDMANN, FREUND and FOLEY.
*22 Mr. Eugene B. Beck argued the cause for appellant.
Mr. Isidor Kalisch argued the cause for respondent.
The opinion of the court was delivered by FOLEY, J.A.D.
Petitioner appeals from a judgment of the County Court reversing an award in her favor entered in the Workmen's Compensation Division. The claim alleged is that petitioner's husband suffered a fatal heart attack which arose out of and in the course of his employment. The sole question for determination is whether the proofs established a causal relationship between the employment and the heart attack.
Our independent review of the evidence commanded by Russo v. U.S. Trucking Corp., 26 N.J. 430 (1958), leads us to concur in the factual findings stated at length by Judge Barrett. Such findings are not in disaccord with those of the judge of workmen's compensation. They follow:
"The late William M. Wilsey, husband of petitioner, Rose Wilsey, was 59 years of age at the time of his death on December 1, 1959. For at least twenty years, and probably for as much as thirty years of his life, he was employed as a roofer. For three years prior to his death Wilsey worked for the respondent, a roofing contractor, with Wilsey's principal work during these three years being on the tar kettle.
Aside from two minor tumor operations and for rheumatism for a few days in 1958, Wilsey was never sick and never complained of his work.
The day before his death he had rested because it was raining and as a result there was no work. When he left home to go to work on his last day he appeared alert, as he also did when observed on this day during work by a fellow employee named Watson, and by the respondent.
Typical of Wilsey's daily work was what he did on December 1, 1959, which was weatherwise a moderate, sunny day. The respondent, petitioner and the witness Watson on this day undertook to put a new roof on a building at Alexander St. in Newark, which consisted of 3 floors and then the roof, making in all 4 flights upstairs to reach the roof. Bringing 3 or 4 cartons of asphalt to the job, the men arrived at about 8 A.M. Watson pulled a small derrick up to the roof. For a time the three worked at scraping off slag from the roof, with petitioner using a broom. *23 At about 11 A.M. petitioner went to the street level to light up the kettle. Respondent and petitioner while on the ground together caused to be hoisted on the derrick about 9 rolls of felt, each roll weighing more than 60 pounds. At about 12 noon work stopped for the lunch hour. It was not the custom of petitioner to eat any lunch, nor did he do so on this day. Instead, he chatted with Watson who sat in the cab of respondent's truck.
Watson, who was to work on the roof with the hot tar to be heated in the kettle, told petitioner the `hot,' as the material is called, would be needed about 1 P.M. After 1 P.M. and in a period of approximately 45 minutes, 7 buckets of hot tar were hoisted up to the roof on the derrick by the petitioner.
The derrick was a pulley device, consisting of a single rope with the weight of the hoisted object being pulled over one wheel. A carton of asphalt at a time would have been picked up from the ground by the petitioner and put in the kettle for heating to a liquid. When heated and placed in a bucket, the liquid tar, called as stated the `hot,' weighed with the bucket some 55 pounds or less. The bucket is not filled full because of the danger of motion spilling some hot tar. Working with the kettle and pulling up of the hot tar was petitioner's normal, regular activity.
After the 7 buckets had been sent up and after a lapse of several minutes, perhaps as much as 15, Watson, who was at a point on the roof where he could not see petitioner, called down the word `hot,' the traditional cry for another bucket, and no answer was received. Respondent, who was working on the roof, looked over a projecting parapet and saw Wilsey lying by his kettle. Respondent and Watson then descended to the street level and called an ambulance. Wilsey, who was dead, looked peaceful. Nothing in the area or about his person existed to suggest a cause of death. Although there was no autopsy, the death certificate recites as the cause of death `sudden death on sidewalk. Occlusive coronary arteriosclerosis.'
There was nothing unusual or abnormal about the activity of the petitioner before his death. Such are the facts.
Saul Lieb, M.D., an internist, was the petitioner's expert witness, and Jerome Kaufman, an expert in internal medicine and cardio vascular diseases, testified for the respondent. Neither saw the petitioner alive. Both answered a hypothetical question. Dr. Lieb's answer was as follows:
`A. Based on the facts you have given me, with my opinion that Mr. Wilsey died as a result of an attack of acute coronary insufficiency, probably superimposed on some pre-existing occlusive coronary sclerosis, and from the facts that you have given me, it is my opinion that the work that he did in the period from 1:00 P.M. to about 1:30 P.M. or 1:45 P.M. when he was found dead, was a competent producing cause of initiating the onset of this attack of acute coronary insufficiency which caused his death.
*24 The work to which I refer is carrying buckets of tar or asphalt weighing fifty-five pounds or less, a distance of fifteen feet from the kettle to the pulley device and then pulling it up four stories to the roof of the building by means of pulley device; assuming that this involved an effort in which he actually was involved in pulling this weight up four stories. If I remember, I am assuming that he did this about seven consecutive times in the same manner in the period between 1:00 P.M. and 1:30 or 1:45 P.M., at which time he was found dead. I would assume that the work involved in this period was competent to produce this attack of coronary insufficiency which caused his death.
Q. Doctor, is it your opinion that there is a causal relationship between the work he was doing at the time and his death?
A. Yes.'
On cross examination he said:
`Q. From the facts that were given to you, how do you know that he died of an acute coronary insufficiency?
A. Well, from all the medical facts, the most recent and probable diagnosis is coronary insufficiency. A man of fifty-nine who dies suddenly, doing a heavy type of exertion. This is our medical experience. The most likely cause of death, if there is nothing else obvious to account for it, is that of acute coronary insufficiency.
Q. How do you know it wasn't acute coronary thrombosis?
A. It is possible. I wouldn't rule out an acute coronary thrombosis.'
He didn't believe death was caused by a cerebral vascular accident. The doctor said he didn't know whether the petitioner was actually doing something when he collapsed and stated it wouldn't make any difference. It wouldn't make any difference, said the doctor, if there had been a 15 minute gap between the time petitioner had exerted an effort in pulling the buckets up and the time he collapsed. The doctor didn't know how long petitioner had been a roofer, but conceded that petitioner probably had more facility for the work than would be possessed by a sedentary worker.
According to the record Dr. Kaufman was given the time when the petitioner was found dead as 10:40 A.M., but I assume this hour is in the record as a typographical error because from other portions of the doctor's testimony it becomes clear he was taking into consideration the actual time of the day when the death was discovered, which was around 1:45 or 2 P.M. In his opinion there was no causal relationship between Wilsey's employment and his death. He states he believes the man died as a result of a very common medical condition, namely coronary arteriosclerosis. In arriving at this conclusion, he took into consideration the normality of the decedent's day's work and the cause of death given in the death certificate. The doctor failed to find any strain or stress in the hypothetical question which could be considered as a contributing *25 factor to his death. In concluding his direct testimony, the doctor said:
`To repeat, I believe he died from a medical condition. He dropped dead suddenly because one of his arteries closed off.'
On cross-examination Dr. Kaufman discussed this point of view at length. He doesn't even think it is possible that the work could have caused the coronary occlusion. He says that there was no strain or stress related to it. He doesn't feel that hard work, assuming the petitioner's work was hard, was a factor in causal relationship."
The real problem which confronts us is the determination of whether there is proof in the case of any work effort by decedent which could reasonably be said to have contributed to his demise. Such proof, of course, need not be in the form of direct evidence; circumstantial evidence would suffice to support the claim. But in the absence of a factual hypothesis, which at the very least indicates a possibility that the work contributed to the death, the occasion for raising this "possibility" to the status of "probability" by an evaluation of the conflicting medical opinions does not arise, since it is well settled that expert opinion is valueless unless it is rested upon facts which are admitted or proved. Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 305, 45 A.L.R.2d 1106 (1954). A hypothetical question cannot be invoked to supply the substantial facts necessary to support the conclusion. Id.
The County Court judge observed that:
"Assuming the correctness of the death certificate as to the cause of death, I do not find myself persuaded by Dr. Lieb's conclusions. Nor for that matter do I necessarily accept the conclusion of the other medical witness in this case, Dr. Kaufman. I am left without being able to form any real judgment as to the relationship, if any, of Wilsey's work to his death."
We can appreciate the dilemma in which the judge found himself, and, indeed, we ourselves are frustrated by a void in the evidence which in our minds inevitably leads us to the conclusion that any medical opinion which might be *26 given as to causal connection between the work and the death would necessarily be based upon conjecture.
Our difficulties in this respect are intensified by our unwillingness to attribute to the death certificate substantial probative value. While N.J.S. 2A:82-12 provides that a certified copy of a death certificate "shall be received as prima facie evidence of the facts therein stated in all courts and places," in assaying the weight of that evidence in the present case we cannot be oblivious of the fact that the stated cause of death was based exclusively upon the observation of the body of the decedent by the attesting doctor. There was no autopsy, no history. Cf. Macko v. Herbert Hinchman & Son, 24 N.J. Super. 304, 307 (App. Div. 1953).
Thus, when the evidence is refined, the residue amounts to no more than this: A healthy, 59-year-old man is at work, the same work he has been doing for 30 years. In the course of it he has occasion to exert physical effort, perhaps substantial physical effort. Nobody is present, hence there could be no word of testimony from which it might be inferred that his efforts were accompanied by symptomatology commonly attributable to the onset of a heart seizure. Ten to fifteen minutes after being last seen he is found dead; he "looked peaceful." Missing completely is any evidence, direct or circumstantial, from which could be inferred a nexus between Wilsey's employment activities as a roofer, and his death.
We are mindful of the rule, that where an employee is found dead from accident and there is no evidence offered as to just how the death occurred, the court will presume that the accident causing the death was one that arose out of and in the course of the employment. See Tully v. Gibbs & Hill, Inc., 12 N.J. Misc. 275, 277, 171 A. 313 (Sup. Ct. 1934). See also Williams v. Corby's Enterprise Laundry, 64 N.J. Super. 561, 568 (App. Div. 1960). However, we find that in each case in which this rule has been invoked the evidence established the occurrence of an "accident" *27 in the ordinary traumatic sense of the word, as distinguished from accident in the special sense that a work-induced heart attack is, in and of itself, an accident within the meaning of the Workmen's Compensation Act. See Mountain Ice Co. v. Durkin, 6 N.J. Misc. 1111, 144 A. 6 (Sup. Ct. 1928), affirmed 105 N.J.L. 636 (E. & A. 1929); Cole v. I. Lewis Cigar Manu. Co., 63 A.2d 293 (Cty. Ct. 1948), affirmed 3 N.J. Super. 157 (App. Div. 1949), affirmed 3 N.J. 9 (1949); Marston v. Curtiss Wright Corporation, 1 N.J. Super. 107 (App. Div. 1948); Green v. Simpson & Brown Const. Co., 26 N.J. Super. 306 (App. Div. 1953), affirmed 14 N.J. 66 (1953); Macko v. Herbert Hinchman & Son, supra; Crotty v. Driver-Harris Co., 45 N.J. Super. 75 (Cty. Ct. 1957), affirmed 49 N.J. Super. 60 (App. Div. 1958), certif. denied 27 N.J. 75 (1958); Gilligan v. International Paper Co., 24 N.J. 230 (1957); Olivera v. Hatco Chemical Co., 55 N.J. Super. 336 (App. Div. 1959), certif. denied 30 N.J. 557 (1959); 120 A.L.R. 684 (1939).
The rationale of the rule is that where death ensues from traumatic injury at a time and place where the employee might reasonably be expected to be in the course of his employment, a presumption arises, or an inference may be drawn that the occurrence arose out of his employment. See Larson, Workmen's Compensation Law, § 10.32 (1952). If the unique concept of heart attack's constituting an "accident," were included within the ambit of this principle, recovery in a heart death case would be permitted upon a mere showing that an unwitnessed fatal heart attack was suffered by an employee on his employer's premises during the hours of his employment. This is not the law of this State.
The most recent case in which the Supreme Court has dealt comprehensively with the problems arising in the heart cases is Dwyer v. Ford Motor Co., 36 N.J. 487 (1962). As we pointed out in Shapiro v. Newark Steel Drum Co., Inc., 72 N.J. Super. 220, 231 (App. Div. 1962), Dwyer *28 rejected the thesis of Jacobs v. Kaplan, 56 N.J. Super. 157 (App. Div. 1959), that a claimant must establish by a preponderance of the probabilities that the work effort preceding the occurrence of a heart attack entailed a stress or strain greater than the ordinary stresses or strains of living. It also rejected the artificial presumption that injury or death from heart disease is the result of natural physiological causes; and the concept that recovery depends upon proof of a single act or a single exertion beyond that usually associated with the work. Parenthetically, we observe that the County Court decided this case prior to the decision in Dwyer, supra, hence relied upon the principles disapproved by Dwyer. However, Dwyer specifically held in dealing with the burden of proof, that:
"* * * The applicable basic and controlling principle as we have already stated it, is simply that the person seeking statutory benefits has the burden of establishing by the greater weight of the believable evidence that the heart attack was caused or contributed to in a material way by the employment exertion." (36 N.J., at pp. 506-507)
For the reasons we have already stated, we conclude that petitioner in the present case failed to sustain this burden. When all is said and done, the evidence does not permit a logical deduction that the performance of Wilsey's employment duties entailed any strain upon his particular cardiovascular system. But even if this hurdle could be jumped, there remains the imponderable question of whether a strain in fact produced his death or whether he died of natural causes. Neither possibility outweighs the other.
Although medical theories vary as to the relationship between exertion and heart attack, and frequently as to the degree of exertion which is required to produce an attack, it is universally understood that persons in apparent good health who have had no previous complaints, can and do suffer sudden fatal heart seizures which are completely unrelated to the exertion of effort. This being true, a *29 court cannot make an intelligent choice between competing medical opinions as to the relationship or lack of relationship between work effort and a heart attack unless there is some evidence from which it becomes inferable that the employment duties may have been a factor causing or contributing to the attack. Indeed, we question that either the pro or con of this proposition can be informedly advanced by doctors in the absence of proof of the victim's work activities, or of the apparent effect of his work efforts upon him prior to his sudden death.
On the facts of this case we find that petitioner failed to sustain the burden of proving that decedent's fatal heart attack arose out of and in the course of his employment.
Affirmed.