SYLVIA DUBIT, PETITIONER-RESPONDENT, v. SHEFFIELD FARMS COMPANY, INCORPORATED, RESPONDENT-PROSECUTOR.

Submitted May 4, 1937—Decided July 17, 1932.

Before Justices BODINE, HEHER and PERSKIE.

For the prosecutor, *Skeffington & Walker* (*James J. Skeffington,* of counsel).

For the respondent, *Andrew J. Markey* (*William Boorstein,* of counsel).

The opinion of the court was delivered by

PERSKIE, J. This is a workmen's compensation case. By concession of counsel for the respective parties, the sole question in issue is whether the employe's death was the result of an accident which arose out of and in the course of his employment.

Sheffield Farms Company, Incorporated, operate grocery stores. In addition to groceries, it also sells provisions, vegetables and milk. It operates twelve of such stores in Bergen county. Decedent was employed by Sheffield Farms Company, Incorporated, which was the respondent below and is the prosecutor here, as manager of its store at Ridgefield Park, New Jersey. In the sense that a purchaser is obliged to pay in cash for the merchandise when it is delivered to him, either at the seller's store or at the purchaser's home, or at the place designated by him, prosecutor conducts this store on what is characterized as a "cash and carry" basis. Prosecutor advertised by a sign on the front of the store (*Exhibit P-5*) that "orders [were] taken for daily route

delivery." It is of no moment whether this sign relates, as prosecutor contends it does, to its milk business alone for which, we are told, it maintains a daily route delivery. For, prosecutor provides general delivery facilities. It provides trucks for that purpose but they apparently are not used frequently; they are only used when, in the judgment of the manager, the merchandise to be delivered constitutes a "great or big" enough load; prosecutor also provides a delivery boy. But that does not constitute all of the delivery facilities which it provided. Did it not also permit its managers (including decedent) to make deliveries with or without their own cars, and within or without the territorial limits of the particular municipality in which the store managed was located? More as to this later.

Decedent was paid $30 a week plus a sum equal to two per cent. upon all sales which he actually made. By further concession, his salary averaged $34 a week; his hours of employment were between seven A. M., to six P. M. The closing hour, however, varied; it was usually as soon after six P. M. as in the judgment of the manager the store could conveniently be closed.

Decedent lived in Bayonne, New Jersey, about fifteen miles from prosecutor's store. He drove to and from his work in his own automobile, maintained and operated at his own expense. In pursuance of a prevailing practice among prosecutor's managers, decedent openly solicited orders from his friends in Bayonne, caused these orders to be filled and placed in his car during business hours, and personally and publicly delivered them after closing hours by the use of his own car.

About seven P. M., on October 12th, 1931, decedent was driving home, and in his car were the filled orders which he had obtained from his friends in Bayonne for delivery to them. His car, for some unexplained reason, left the public road, at a point about five hundred feet south of the Public Service power station on Tonnele avenue, route No. 2, in the township of North Bergen, New Jersey, turned down an embankment and dropped into a hole where he was found unconscious; his car was found overturned and alongside his

body; the groceries and provisions intended for delivery were strewn about the scene of the accident. Decedent was taken to the Jersey City Medical Center where, about three minutes after his admission, he was pronounced dead. Upon his person were found six delivery slips; they were all dated October 12th, 1931, and all were in the handwriting of the deceased. The names on some of the slips corresponded to the names of some of the witnesses who testified that they had given decedent orders which he was to have delivered to them on the day of the accident; and the groceries and provisions strewn about the scene of the accident likewise corresponded to the orders given and to be delivered.

In the bureau, the referee determined as a fact that the groceries and other commodities in the car added nothing to the risk or hazard; that in no way did they play any part in the casualty and same could have occurred with an empty machine as well as with one containing these orders; that there was no necessity to, and decedent did not, deviate from his regular route to his home; that what decedent did was outside the scope of his contractual obligation; and, therefore, concluded that petitioner had failed to sustain the necessary burden of proving that decedent met with an accident arising out of and in the course of his employment.

The learned judge of the Common Pleas Court took the contrary view. He found that there was no proof of any order given decedent prohibiting the use of his car for the purpose of making deliveries personally; that decedent was given wide discretion of judgment in the management of the store, including the use of facilities for delivery provided by prosecutor, or the use of his own car, and that prosecutor well knew of the practice employed by decedent and its other managers in making personal deliveries; that the prosecutor, therefore, "acquiesced therein and consented thereto." Accordingly the judgment of the bureau was reversed. The Supreme Court granted *certiorari*.

Prosecutor now argues generally that the death of decedent was not the result of an accident arising out of and in the course of his employment. More particularly, is it argued

that the death of decedent was not the result of an accident "in the course of" his employment. That argument is made to rest upon the premise that the decedent was at the time of the accident performing an act of his own choosing, outside the sphere of his contract of employment, and contrary to the order of the prosecutor. In short, prosecutor takes the position that decedent's death was the result of an accident common to the traveling public on the road at that particular time and not by reason of the fulfillment of his contract of service with the prosecutor, or anything reasonably incidental thereto.

Prosecutor seeks to sustain its argument by the claims that the proofs tend to show that it maintained sufficient trucks and other facilities for delivery purposes; and that it specifically forbade decedent, as it did all of its managers, from making deliveries in their own cars. While the proofs, as already indicated, do support the claim that prosecutor maintained trucks and other delivery facilities, yet we search the record in vain to find proof of the fact, and industry of counsel points to none, that decedent was forbidden to use his car to make deliveries. Such proof is simply not present. Of the several managers who testified, all but one never knew nor heard of the existence of such a prohibitory order. The testimony of the one manager who testified to the contrary is not at all clear or convincing. But it is clear, notwithstanding his alleged knowledge of the order and the fact that a breach thereof would lead to his dismissal, that as late as February 8th, 1932, he made a delivery in his own car from his store in Jersey City to a purchaser in Bayonne, New Jersey. He was not discharged. The proof is clear that the other managers made deliveries both within and without the territorial limits of the municipality in which the store they managed was located. Let it be observed that such deliveries were made openly, publicly, and in addition thereto, as to decedent, they were frequently made. No manager, for aught that appears, has been discharged for a breach of this asserted prohibitory order. That is, to say the least, significant. It rather lends persuasion and conviction to the conclusion

that the prohibition, if it did in fact exist, was "more honored in the breach than the observance." Prosecutor's superintendents visited the store managed by decedent at least twice a week and spent between fifteen minutes and an hour at each visit. They brought decedent's attention to a general letter addressed to all managers concerning shortages; they made the manager sign the receipt of the letter, but not a word was said concerning the practice, or prohibition, of deliveries.

*First:* It appears to us that prosecutor cannot and should not be permitted to avoid its responsibilities towards its employes by pointing to an order, even if properly made and communicated to its employes, when, as here, it acquiesced in and consented to the violation thereof. Action and not mere words must control. The proofs convincingly support the conclusion that "regardless of where the goods were delivered, the prosecutor was interested in the amount of gross sales;" that it was looking for "volume business;" that the continued relation of decedent as manager, his advancement with prosecutor largely depended upon his ability to produce results—sales. It paid decedent, and all other managers, commissions on all sales which they made regardless of where delivery thereof took place. It is no answer for prosecutor to say that it had no knowledge of the fact that decedent was making deliveries in his own car. The proofs do not support that answer. On the contrary, they support the conclusion that prosecutor had knowledge of the fact. Decedent merely followed prosecutor's method of doing business. But even if it is to be assumed that prosecutor did not have actual knowledge, the conclusion is inescapable that, under the proofs exhibited, if it had exercised ordinary and reasonable diligence, it would necessarily have ascertained the fact. That is sufficient.

We are entirely satisfied that the legal proofs and the proper inferences to be drawn therefrom fully support the conclusion that the death of decedent was the result of an accident which arose out of and in the course of the employment. *Hulley* v. *Moosbrugger,* 88 *N. J. L.* 161; 95 *Atl. Rep.*

1007; *Bryant* v. *Fissell,* 84 *N. J. L.* 72; 86 *Atl. Rep.* 458; *Nardone* v. *Public Service, &c., Co.,* 113 *N. J. L.* 540; 174 *Atl. Rep.* 745; *Belyus* v. *Wilkinson-Gaddis Co.,* 115 *N. J. L.* 43; 178 *Atl. Rep.* 181; *affirmed,* 116 *N. J. L.* 92; 182 *Atl. Rep.* 873.

*Second:* We could perhaps, with propriety, stop at this point. But in view of the argument made we desire to point out that our result would not be different if in fact decedent had violated the alleged prohibitory order. It is, of course, clear that an employer has the right to make reasonable rules in the operation of his business which concern the conduct of the workman within the sphere of his employment, and which limits the sphere itself. See annotations Workmen's Compensation: "injuries received while doing prohibited work." 23 *A. L. R.* 1161; 58 *Id.* 197; 76 *Id.* 166; 83 *Id.* 1211. Not every violation of a prohibitory order necessarily results in a denial of the workman's right to compensation. The line of demarcation is ofttimes very finely drawn; it is, however, marked and discernible. Thus, for example, in the case of *Reimers* v. *Proctor Pub. Co.,* 85 *N. J. L.* 441; 89 *Atl. Rep.* 931, it was held that the prohibited use of the car had been "so frequent and so public" that had it not been for the specific prohibition by those in authority, *not to use the car on the day of the accident,* the trial judge would have been sustained in finding that the employe was justified in using the car notwithstanding the prohibition. And in *Smith* v. *Corson,* 87 *N. J. L.* 118; 93 *Atl. Rep.* 112, which involved the prohibited use of a scaffold and the prohibition not to do any climbing, recovery was not allowed. In each of these typical cases the transgression took the workman outside the sphere of his employment and, therefore, compensation was denied.

But in the case of *Kolaszynski* v. *Klie,* 91 *N. J. L.* 37; 102 *Atl. Rep.* 5, the use of wood alcohol to light fires when the use of kerosene or anything like that was prohibited was held not to defeat compensation. And in *Morris* v. *James Bell Co., Inc.,* 10 *N. J. Mis. R.* 619; 160 *Atl. Rep.* 211, the prohibited riding on top of the cab of a truck was held not to preclude

recovery. *Cf. Belyus* v. *Wilkinson-Gaddis Co., supra* (at *p.* 51) and authorities therein collated. Thus in each of the last two cited cases the transgression was held to relate merely to a prohibition within the sphere of the employment, *i. e.,* "as to the way in which the work should be done," and compensation was allowed. The prohibitory order in the case at bar, if it did in fact exist, would appear to come within the holding of the two cases last cited allowing compensation.

*Third:* As we have seen, the result of decedent's making deliveries in his own car was a practice which was obviously beneficial both to the employer and employe. It was, therefore, only natural that it should have developed into a common practice—a practice which had for its objective the fruits of the contract which each party made for himself. Death resulting from an accident which occurred under such circumstances is one arising out of and in the course of the employment; it is compensable. *Rubeo* v. *Arthur McMullen Co.,* 117 *N. J. L.* 574; 189 *Atl. Rep.* 662.

The judgment of the Common Pleas Court is affirmed, with costs.