55 N.J. Super. 138 (1959)
150 A.2d 55
ANTHONY JASAITIS, PETITIONER-APPELLANT,
v.
CITY OF PATERSON, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 2, 1959.
Decided April 6, 1959.
*140 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. John C. Wegner argued the cause for petitioner-appellant.
Mr. Ervan F. Kushner argued the cause for respondent-respondent.
The opinion of the court was delivered by CONFORD, J.A.D.
The petitioner was injured as he slipped on an icy walk just after alighting from a bus on his way home from duty as a patrolman on the police force of the defendant municipality. On his application for workmen's compensation for the resulting injuries he had a recovery in the Division of Workmen's Compensation but sustained a reversal in the Passaic County Court. On appeal to this court the matter was remanded for further proofs in the Division. Jasaitis v. City of Paterson, 48 N.J. Super. 103 (App. Div. 1957). In the remanded proceedings the petitioner again prevailed in the Division but not in the County Court. We thus have the case for a second time on this appeal.
Two issues were discussed in the prior opinion of this court. First, was the bus trip home within the ambit of the employment under any of a number of stated exceptions to the general rule that an accident on the way to or home from work is not compensable? Second, did the actual accident occur in sufficiently close relationship to the transportation as to be referable thereto for compensation purposes? The conclusion was that there was mistaken reliance in the Division upon supposed stipulations concerning the first-stated issue and that the interests of justice required a remand for further proofs on both issues (48 N.J. Super. at p. 111). The whole case was reopened for consideration by the Division anew. Ibid. The ensuing discussion is therefore confined to the proceedings upon remand.

*141 I.
Among the exceptions to the rule of no recovery for accidents sustained while going to and from home, which were noted in the former opinion, are these: when "transportation is furnished by the employer to and from the place of employment"; and when "the employer has furnished transportation to the extent that it has ripened into a `custom.'" Now that we have a fuller factual record before us, it appears that a determination of the cause requires consideration as to whether the exceptions stated are not subject to further amplification in relation to the precise case before us.
In Rubeo v. Arthur McMullen Co., 117 N.J.L. 574 (E. & A. 1937), where a superintendent of the employer followed the practice of transporting the deceased workman to and from work in a truck, there was a reversal of a decision of the former Supreme Court denying compensation on the ground (below) that the transportation was a mere matter of convenience to the workman which had not "`ripened into a custom to such an extent as to become part of the contract of employment.'" The Court of Errors and Appeals held that the "liability of the employer in the premises is not so * * * circumscribed"; that the accident would nevertheless be compensable if the transportation were "the result of a practice between the parties which is beneficial both to the employer and employee" (117 N.J.L. at p. 578). The cause was remanded to the Supreme Court for the making of findings of fact as to what was "the continued practice, or the course of business actually followed concerning the transportation of the deceased even though it may not have been the result of either [sic] an express contract or may not have ripened into a custom between the parties," and whether "it [was] for the benefit of both employer and employee" (ibid., p. 579).
*142 On the remand the Supreme Court found in the affirmative on the issues stated and awarded compensation, 118 N.J.L. 530 (Sup. Ct. 1937), affirmed 120 N.J.L. 182 (E. & A. 1938). The court said: "* * * the furnishing of this accommodation grew, with the knowledge and acquiescence, if not indeed the direction, of the employer, into a practice grounded in mutual convenience and advantage" (118 N.J.L. at p. 532). In a later case it is said that "the basis for our application of the exceptions to the general rule [is] made to rest upon the conduct, the action of the parties with relation to the transportation of the workman to and from his work." Micieli v. Erie Railroad Co., 130 N.J.L. 448, 453 (Sup. Ct. 1943), affirmed 131 N.J.L. 427 (E. & A. 1944).
We shall have more to say hereinafter concerning the law on the subject at hand, but the basic principles upon which the factual case before us is to be appraised are those stated in the cases cited.
Petitioner's testimony concerning his use of buses was, in effect, as follows. Ever since his joining the Paterson police force in 1928 he has while in uniform ridden the buses without ever being required by bus operators to pay fare. Occasions for such use of buses arose from time to time while on duty and also while off duty. The latter occasions were when going from home to duty or going home from duty, in uniform. An instance of this was the trip home the day he was injured. When riding the buses home he has been expected or called upon at times by bus operators to prevent disturbances or enforce compliance by passengers with regulations, such as prohibition of smoking, etc. He admitted that a locker is provided for him at headquarters where he may leave his uniform when off duty if he wishes to do so, but he chooses to wear the uniform when travelling back and forth between home and headquarters.
Petitioner's strict tour of duty terminates for any given day when he "report[s] back to the bench and salute[s] in." If he goes home wearing his uniform, however, he is subject *143 to certain rules and regulations in the police manual applicable to any officer wearing a uniform, such as not carrying packages, not entering stores of certain kinds, and being expected to keep order and make arrests for violations of law as though he were actually still on official duty. The manual also requires doffing the uniform within one hour after finishing duty.
William J. Kearns, a motorcycle officer of the respondent, testified as a witness for petitioner that he has had occasion to ride buses while on duty when he could not ride his vehicle. In some instances he has been ordered to take a bus in order to report for school crossing duty. In every such case his bus ride has been without charge, the drivers always indicating he is not to pay.
Daniel Murphy, chief of police for a year, and a police officer in the city for 36 years, was called as a witness for respondent. He testified that policemen are not entitled to free transportation to and from work under the regulations of the board of police and fire commissioners, which governs both of the public safety forces. The regulations were not put in evidence. Adequate appreciation of the significance of the remainder of his testimony requires reference to R.S. 48:3-32. This enactment requires public transportation companies to transport without the collection of fares uniformed public officers while on duty and certain designated non-uniformed law enforcement officials while on duty where their duties require police activity to be performed without uniform. The equivalent fare is credited to the utility against franchise taxes apportioned by law to the municipality where the transportation takes place. Prior to 1929 there was no such credit for the utility. L. 1912, c. 159; L. 1929, c. 324.
Much of Murphy's testimony on direct examination was given in the form of categorical responses to pointedly leading questions. The resolutions appointing policemen do not mention "credit for transportation to and from work." Murphy identified a ticket book containing blank forms of *144 tickets purportedly issued by Public Service Coordinated Transport "in accordance with Section 48:3-32 of the Revised Statutes (N.J.)." The conditions for use are specified on the back of the book. One of these states the ticket is good "only in connection with official business." Each ticket must contain a written specification by the officer of the bus line number, date, boarding and destination points, signature, badge number and name of municipality, when presented in lieu of fare. The last three items may be indorsed in advance, the others only when boarding the bus. No individual who ever used such tickets was offered as a witness, nor any Public Service representative to testify as to whether or not in practice bus operators permitted uniformed policemen to ride without them, or exacted compliance with the conditions on the tickets from those submitting them.
Respondent also placed in evidence a list of some 57 police officers prepared by the previous chief of police January 6, 1956 and identified as those "to whom Police Pass Books may be issued." These persons were almost all non-uniformed personnel, "principally detectives, people who have special assignments."
Early in his cross-examination Murphy testified: "Q. Isn't it true that a police officer in uniform rides free on the buses (adding, `at any time in uniform')? A. I have no knowledge of it. It is possible they do it, but I have no proof of it." When asked about the practice in the early days of his tenure on the force in the 1920's, he said "at no time" did he pay any fare while in uniform "coming from home or going to home." "That was the policy in those days."
During one colloquy in the course of the cross-examination of Murphy, counsel for respondent volunteered that when pass tickets are utilized the Public Service returns them to the city and the city deducts "that amount from the franchise tax which the Public Service has to pay the City." Thereupon *145 the following significant passage appears in the transcript:
"The Deputy Director: What about these other ones? That's what I am interested in.
The Witness: They turn the officer's badge number in, if he is in uniform.
Mr. Kushner: Yes, if he is on duty.
The Deputy Director: How do they know?
The Witness: He doesn't have to inform them. The fact of his being on the bus in uniform, they know his badge number, and turn it in.
The Deputy Director: They don't just put their hands over the slot?
The Witness: No.
The Deputy Director: Then the City does, in a sense, furnish transportation?
The Witness: I guess they have to under those conditions. I don't know." (Emphasis ours)
Murphy testified that an order was issued by the chief of police in or about 1933 prohibiting policemen riding free on buses when off duty. He had not been able to find a copy of it at the time of hearing. Asked whether uniformed men continued to ride free thereafter, he testified: "Not to the extent they did prior to that. Q. They did, though? A. Those that did understood it was going to be deducted from the franchise tax, and the City of Paterson didn't approve of it." Asked whether he would consider a free bus ride by a policeman as a present or contribution by Public Service, he said, "A. I didn't consider it as a contribution. I understood they were deducting it from the City." No policeman has ever been brought up on charges for riding free in uniform, or been discharged for that reason. Cf. Dubit v. Sheffield Farms Co., Inc., 118 N.J.L. 411, 415, 416 (Sup. Ct. 1937).
Captain Vander Bok, secretary to Chief Murphy, testified for respondent that he knew of no authority to permit off duty officers to ride buses free. He was then asked: "Q. You are aware, are you not, that an officer in uniform who is on duty is entitled to ride free on the * * * bus?" *146 and responded: "A. We always have." A detective on duty is furnished bus tickets "because he is not readily identifiable to the bus driver while on duty."
On cross-examination he said there is no objection to a police patrolman wearing his uniform home from duty and some do.
He said a bus operator has no way of determining whether an officer in uniform is on duty unless he asked, and that he "presume[s] they don't" usually ask. In his own experience he has never been asked. The 1933 prohibitory regulation is not read to new officers coming on the force and is not in the police manual. Asked whether he stopped riding free when the 1933 directive came out, he answered, unresponsively: "A. Once the order came out, we were bound by that."
A letter was introduced into evidence dated September 27, 1933 from the clerk of the board of police and fire commissioners commending the then chief of police for his cooperation "in cutting down the cost of transportation of men who ride buses."
Although not argued by respondent in precisely that form on this appeal, it was suggested on its behalf before the Deputy Director in the Division of Workmen's Compensation that the statute cited above precluded any lawful foundation for recovery in workmen's compensation on the basis of a custom or practice of the city in permitting uniformed policemen to ride buses free. It is stressed that the statute (R.S. 48:3-32) applies only to policemen "while engaged in the performance of their public duties," whether in uniform or not. For this purpose we assume, contrary to petitioner's argument that a man in police uniform is automatically charged at all times with the performance of his public duties, that petitioner was off duty while on the bus going home.
The statute is part of Title 48 of the Revised Statutes, which is concerned with the regulation of public utilities. It does not purport to be concerned with any public policy *147 relating to employment relations between municipalities and their policemen. The statute in question therefore reflects no legislative policy forbidding a municipality from permitting uniformed police officers, as between them and the municipality, to ride buses home free of charge, whether at the cost of the municipality or otherwise. It merely compels transportation utilities to permit policemen on duty to ride without fare, allowing them to be reimbursed therefor by credits on franchise taxes. It does not legislate one way or the other as to the legality of any voluntary arrangement, express, implied, or acquiesced in, between a utility, a municipality and its police personnel, whereby uniformed policemen are allowed to ride without fare and without question as to performance of duty, the utility deducting the fare from franchise taxes.
It is of interest that both of the predecessor enactments of R.S. 48:3-32 were sustained as constitutional on the theory that the object of the legislation was to extend police protection to public conveyances and their occupants. State v. Sutton, 87 N.J.L. 192 (E. & A. 1915); City of Newark v. Public Service Coordinated Transport, 9 N.J. Misc. 722 (Sup. Ct. 1931), affirmed 109 N.J.L. 270 (E. & A. 1932). It is obvious that such a purpose is subserved by the presence on a bus of a uniformed policeman, committed by discipline and regulations to the enforcement of law and order, and no less so by mere reason of the fact that he is on his way home after completion of his regular tour of duty.
We return to the question of whether petitioner's bus ride home in uniform is shown by the evidence to have been part of a "practice" or "course of business actually followed" and "grounded in mutual convenience" of municipality and employee-policeman, within the cases cited. As noted by the authorities, the "conduct" of the parties is the most persuasive element in this regard. The Deputy Commissioner found that while petitioner was not on "active" or "regular" duty while on the bus, and there was an outstanding order against free transportation, it nevertheless was "tolerated" *148 by the city and the city paid for it indirectly. He accordingly arrived at the conclusion that the city "furnished" the transportation, within the exception to the rule against recovery. The County Court found no "custom" of transportation "which would be binding" on respondent and no contractual obligation therefor.
As seen above from the Rubeo case, these latter conclusions, even if accepted, would not necessarily be controlling. As already stated, there is liability if there was a continued practice or actual course of conduct respecting the transportation, beneficial to both parties, and an accident occurs in the course of it. Our careful study of the entirety of the evidence of record (outlined above), enjoined upon us as a de novo obligation by Russo v. United States Trucking Corp., 26 N.J. 430 (1958), and Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445 (1958), convinces us that as of, and for some appreciable period of time prior to the accident here involved, there was a well-established de facto practice of uniformed policemen being allowed, if they so chose, to travel home on buses without fare, the tacit understanding between the city and the Public Service being that the latter would record all police riders in uniform without checking to verify whether they were technically on tour of duty and would be allowed to deduct for all such transportation from franchise taxes.
There is not the slightest basis to doubt the truthfulness of petitioner's testimony that he followed such a practice. It seems hardly likely that this could have gone on for any substantial length of time with the collaboration of the bus operators without being generally known to the police administration and the city officials. If, as is properly inferable from the proofs, fares were being deducted from franchise taxes, the city must have known of the situation. We have no doubt that Chief Murphy testified truthfully when he said that an order prohibiting free rides off duty was issued in or about 1933. But as to whether an actual practice to the contrary existed as of the time of petitioner's accident, *149 his testimony was inconsistent on its face. He blew hot and cold. We are impressed, not alone from his own testimony taken as a whole, but from circumstantial corroboration by that of the other witnesses on both sides, that the crucial and telling clue to the actually existing situation was revealed in the colloquy between the Deputy Director and the chief when the latter said that a uniformed policeman "doesn't have to inform" the bus operator whether he is on duty; that the operator accepts as conclusive "the fact of his being on the bus in uniform" and turns in his badge number for the tax deduction.
In short, the quondam formal prohibitory regulation is easily evaded in practice, assuming it is generally known. But there is no indication that the rank and file of the men even know of it. The proof is they are never told about it when hired or at any other time, and no one is disciplined for disregarding it. The practice of riding without fare by uniformed policemen is obviously tolerated and acquiesced in by the city. The Public Service seemingly has no objection to the tacit arrangement, as it swells its gross receipts in the indirect form of franchise tax deductions. The city, whether it bargains for it or not, gets the benefit in added public protection of the presence of a uniformed policeman on the bus going or coming between home and headquarters (as well as on the street between home and bus line). Cf. Tocci v. Tessler & Weiss, Inc., 28 N.J. 582 (1959). The patrolman certainly renders a quid pro quo for his transportation, as the public wearing of the uniform compels his assumption of continuing responsibility for enforcing law and order and entails the other personal inconveniences attendant thereon mentioned above.
Exercising our responsibility as fact-finders on this review, we find from a substantial preponderance of the credible proofs the clear existence of a practice and an actual course of conduct known to and in fact acquiesced in by the city for patrolmen like petitioner at their election to ride home in uniform free of charge. Since, as is obvious, the *150 practice is mutually beneficial to employer and employee, an accident in the course of such transportation meets the test of compensability of the cases cited above. See also Vogt v. Borough of Belmar, 14 N.J. 195 (1954), wherein, in different circumstances, a municipality was held liable for workmen's compensation to an injured voluntary fireman on the basis of "a long-continued course of conduct" in which the municipality had acquiesced, and this notwithstanding a formal disentitlement to employee status on the part of the petitioner. "The beneficent policy of the compensation provision is not to be whittled away by over-nice distinctions and technical formality unrelated to the substance of the right." Ibid. (14 N.J. at pages 207, 208).
In further support of the concept that a practice or course of conduct for transportation home, where of some benefit to the employer, and whether or not a part of the employment contract, supports compensability for an accident in course thereof, see 1 Larson, Workmen's Compensation Law (1952), § 17.30, p. 236; § 18.34, p. 259; 99 C.J.S. Workmen's Compensation § 235, p. 837; 58 Am. Jur., Workmen's Compensation, § 217, pp. 723, 724.
Anent the possible factor of rule violation by an employee (but no knowledge of the prohibitory rule was brought home to the instant petitioner), note Dubit v. Sheffield Farms Co., Inc., supra (118 N.J.L. at p. 416), where an employee was fatally injured in the course of a trip home from work, during which he intended to make deliveries from his own car, in contended violation of a company rule prohibiting that practice. The court allowed compensation, stating that if such an order existed the company "acquiesced in and consented to the violation thereof. Action and not mere words must control."
We thus conclude, on the heretofore considered aspect of the case, that for the reasons stated petitioner was on a work-connected journey in the course of his employment on the bus trip home.

*151 II.
We next face the question as to whether the circumstances as to the actual casualty preclude its being properly held to have arisen out of as well as in the course of the employment.
On direct examination petitioner testified: "At Martin and 21st Avenue is where I got off [the bus]. Immediately after I stepped out of the bus I slipped and fractured the ankle." On cross-examination, in answer to a question as to "how many feet from the bus" he was when he slipped, he said, "Around four feet." The cross-examination continued:
"Q. Was is an icy sidewalk? A. Yes.
Q. Had you taken about four steps from the bus at the time you slipped? A. No.
Q. How many? A. The minute I stepped off the steps my feet went from under me.
Q. Your feet were not on the bus when you slipped, were they? A. No."
In answer to a question from the Deputy Director as to whether he was "entirely free of the bus" when he fell, he answered in the affirmative and said he was not holding any part of the bus at the time.
The Deputy Director found that petitioner had physically left the bus but that he was in a "twilight zone" in respect to the transportation wherein he should be accorded the "broad or more favorable interpretation," bringing the accident within the employment. The County Court concluded that the facts just stated precluded compensation. We think recovery is indicated by the factual situation presented.
As shown, petitioner's testimony is to the effect that he slipped with his very first step after alighting. His official report of the accident, introduced in evidence by respondent, indicates that he was assisted on the spot by the bus driver. The immediacy of the fall in relationship to the descent from the bus is apparent. Had he not alighted from the bus at *152 that particular place, he would very probably not have slipped on the icy patch of walk to which he was brought with the first step he took after physically clearing the vehicle. But for the work-associated trip home he would not have sustained the particular injury. The accident was work-connected in both the "out of" and "in the course of" senses. Gargiulo v. Gargiulo, 13 N.J. 8, 13 (1953); Howard v. Harwood's Restaurant Co., 25 N.J. 72, 82, 83 (1957); Crotty v. Driver Harris Co., 49 N.J. Super. 60 (App. Div. 1958), certification denied 27 N.J. 75 (1958).
The liberal spirit in which the Workmen's Compensation Act is properly to be interpreted and applied does not tolerate the splitting of so fine a hair as would be entailed by the denial of recovery here on any hypothesis that the locale or circumstances of the injury are too remote from the transportation, whether physically, causally or in any other sense. See also Lehigh Navigation Coal Co. v. McGonnell, 120 N.J.L. 428 (Sup. Ct. 1938), affirmed 121 N.J.L. 583 (E. & A. 1939); cf. Nevada Industrial Commission v. Leonard, 58 Nev. 16, 68 P.2d 576 (Sup. Ct. 1937); Owens v. Southeast Arkansas Transp. Co., 216 Ark. 950, 228 S.W.2d 646 (Sup. Ct. 1950); Radermacher v. St. Paul City Ry. Co., 214 Minn. 427, 8 N.W.2d 466, 145 A.L.R. 1027 (Sup. Ct. 1943); Kramer v. City of Philadelphia, 179 Pa. Super. 129, 116 A.2d 280 (Super. Ct. 1955).
The judgment of the County Court is reversed and the award in the Division of Workmen's Compensation is reinstated.