WINNIE DUDLEY, AS ADMINISTRATRIX OF THE GOODS, CHATTELS AND EFFECTS OF RAYMOND L. DUDLEY, DECEASED, AND AS ADMINISTRATRIX *AD PROSE-QUENDUM* OF RAYMOND L. DUDLEY, DECEASED, PLAINTIFF-RESPONDENT, v. VICTOR LYNN LINES, INC., A CORPORATION, DEFENDANT-APPELLANT.

Argued March 21, 1960—Decided May 23, 1960.

480

482

*Mr. Aaron Gordon* argued the cause for the plaintiff-respondent (*Messrs. Hirschberg, Nashel, Zorn & Cronson,* attorneys).

*Mr. William R. Morrison* argued the cause for the defendant-appellant (*Messrs. Morrison, Lloyd · & Griggs,* attorneys).

*Messers. Carpenter, Bennett & Morrissey,* attorneys for United States Fidelity & Guaranty Co., Workmen's Compensation Carrier of Victor Lynn Lines, Inc., *amicus curiae.*

The opinion of the court was delivered by

PROCTOR, J.   The plaintiff's decedent, Raymond Dudley, died of a heart attack while an employee of the defendant company.   The plaintiff, his widow, instituted an action in tort for wrongful death, and also filed a petition under the Workmen's Compensation Act.   The question now presented is whether in the circumstances an action in tort lies, or whether the Workmen's Compensation Act extends its exclusive benefits to the plaintiff for her husband's death, thus barring her action at law.

The testimony for the plaintiff in her tort action revealed the following:   Raymond Dudley, 43 years of age, was employed as a truck driver by the defendant Victor Lynn Lines, Inc.   For several days prior to February 23, 1955 Dudley was suffering from a cold.   When he reported to work at the defendant's terminal in Kearny, New Jersey, on the morning of the 23rd, he complained of his cold to John Funke, the defendant's assistant terminal manager, and requested to be assigned to a route in New Jersey. He had already been assigned, however, to a routine run with a refrigerator truck to the Merchants Refrigerating Company in lower Manhattan, New York City.   At the time, Dudley made no complaint to Funke of serious illness or incapacity to perform his ordinary work.

Traffic being heavy, the trip to Manhattan took almost two hours, until about 10:45 A. M.   Dudley drove and was accompanied by a helper, Robert Ventura, aged 18.   During the trip, Dudley complained to Ventura of not feeling well, but he seemed to Ventura to be functioning normally.   Upon

reaching the New York destination, Dudley entered the office of the Merchants Company, where he remained for about 15 minutes. He then emerged and drove his truck around the block a few times, found a parking space at the loading dock, and parked.

At about 11:25 A. M. Dudley again complained to Ventura that he was not feeling well. His arms were stiff, he was sweating and his nose was running. He asked Ventura to call the defendant's terminal and report that he was sick. At about 11:30 A. M. Ventura called and told Funke that Dudley was sick and wanted a relief driver. Ventura testified that Funke "said as soon as he could he would send somebody, he would send them over, and in the meantime for him to sit in the cab and for me to take care of everything, start unloading." Ventura further testified that a few minutes after making the call, he saw Dudley walking around the truck staggering as if he were drunk. Dudley said he had never felt that way before. He sat in the cab of the truck, sweating, and Ventura began to unload. Later Dudley took a short walk.

After a while, Dudley requested Ventura to call the plaintiff, his wife, to ask that she have her brother come to New York and pick him up. The call was made at about 12:15, but the plaintiff was unable to reach her brother. At about 12:30 she called Funke. She testified:

"I told him I had a call from Ray's helper and that Ray was sick and that he wanted me to get my brother, and then I couldn't get my brother so Mr. Funke said he had heard that Ray was sick in New York but for me not to worry and he would get in touch and I call him back later."

At about 1:00 the plaintiff again called Funke. She testified:

"He told me he got in touch with New York—I don't know with whom—and that Ray was feeling a little better and he would send help out and get a doctor and for me not to worry, there was a truck somewhere, I don't know, and for me to stay home in case there be another call and not to worry, that they get a doctor."

After his lunch, Ventura continued unloading the truck until 2:00 or 2:30. During that time he was occasionally able to see Dudley in the cab. He looked worse. He was sweating, coughing and spitting, and was restless; "one minute he was lying down and the next minute he was sitting up." But Dudley at no time asked Ventura for aid or medical attention. Sometime between 2:00 and 2:30, Ventura was informed that Dudley had fallen from the cab. An ambulance was called. It arrived at about 2:30 and Dudley was pronounced dead.

A relief driver arrived from the defendant's terminal at 3:00. No doctor had ever been called by Funke. It was only when the plaintiff again called Funke at 4:30 that she was told of her husband's death.

The plaintiff's tort action was instituted in the Superior Court, Law Division, under the New York Decedent Estate Law. (*McKinney's Consolidated Laws of New York, c.* 13 § 130.) In her complaint she alleged that the defendant negligently failed to furnish medical aid to her deceased husband in his emergent condition, in violation of the "humane instincts" doctrine. She also alleged that the defendant negligently failed to furnish medical aid to her deceased husband which it assumed to furnish. The defendant's answer denied negligence, asserted that Dudley had been guilty of contributory negligence, and also alleged that Dudley's death arose out of and in the course of his employment and was therefore compensable solely under the Workmen's Compensation Act.

At the trial, the testimony for the plaintiff revealed the circumstances of Dudley's death as described above. The plaintiff also introduced expert medical testimony to the effect that the onset of Dudley's heart attack was at about 11:30 A. M., and that it was not work-connected, and that prompt medical aid would probably have prevented his death.

It was assumed below and here that as the alleged tort occurred in New York, the law of that state controlled the negligence action. In the absence of evidence of the law

of New York, the trial judge properly assumed that it was the same as the common law in New Jersey.

At the end of the plaintiff's case, the defendant moved for a judgment of dismissal on the grounds that the action was cognizable only under the Workmen's Compensation Act, and that the plaintiff had not proved either that the defendant negligently failed to satisfy its duty to render or procure emergency medical treatment for Dudley, or that the defendant negligently failed to supply medical aid it had voluntarily assumed to supply.

The trial judge granted the defendant's motion, stating that the Workmen's Compensation Act did not bar the action, but holding that the plaintiff had failed to prove that the defendant had acted negligently. On appeal, the Appellate Division held that Dudley's heart attack was not work-connected, and therefore his death was not within the compensation act. It agreed with the trial court that the plaintiff had not proved that the defendant had negligently failed to provide emergency medical treatment. It reversed the judgment below, however, on the ground that a jury question was presented whether Dudley's death had been caused by the defendant's negligent failure to furnish medical aid after having gratuitously assumed to do so. 48 *N. J. Super.* 457 (*App. Div.* 1958).

This court granted certification on the defendant's petition. 26 *N. J.* 305 (1958). We requested argument on the question whether, assuming the heart attack itself was not work-connected, the plaintiff's claim was nonetheless within the compensation act. We invited a brief *amicus curiae* from the defendant's compensation carrier, which happened to be also the defendant's liability insurance carrier. Speaking through its counsel in the tort action, the carrier maintained the alleged claim was compensable. Speaking through its counsel in the compensation cause, it joined with the plaintiff and argued to the contrary.

In our *per curiam* opinion, 28 *N. J.* 576 (1959), we expressed our feeling that the issue this projected should

not be decided unless the facts should so require. We therefore held the appeal pending trial of the already instituted compensation case upon the issue of the heart attack's work connection (in view of *Ciuba v. Irvington Varnish & Insulator Co., 27 N. J.* 127 (1958), decided after the opinion of the Appellate Division in the present case), and upon the issues whether there was a negligent failure to provide medical aid despite the duty imposed by the "humane instincts" doctrine and by the voluntary undertaking to provide such aid. We concluded our opinion as follows:

"If work-connection should be found with respect to the heart attack, the remaining issues will be academic, since we have no doubt that if the heart attack is a compensable event, plaintiff may not mount an additional claim at law upon the theory that but for a negligent failure to give medical aid the employee would have lived. If, on the other hand, the heart attack as such was not compensable, the remaining issues will require consideration in the light of the full factual findings thereon made by the Division. After initiating an appeal from the Division's judgment, either party may immediately petition this court for certification of the matter. The present appeal will be held pending such further proceedings."

On May 29, 1959 the compensation cause was heard. The parties stipulated that the record of testimony at the trial of the tort action be admitted and given the same. effect. Additionally, the testimony of three medical experts was introduced, two for the plaintiff and one for the defendant. All three experts agreed that the heart attack itself was not work-connected, and the deputy director properly so found. Plaintiff's two experts testified that Dudley's death was probably attributable to his failure to receive prompt medical attention. The defendant's expert testified this was a matter of speculation.

The Deputy Director concluded, on this branch of the case, that it was unnecessary for him to decide whether the defendant "failed to act in a humane manner in rendering medical assistance," and he therefore made no factual findings on that issue. He felt that his jurisdiction was limited

to finding whether the death "was the result of an 'accident arising out of and in the course of his employment.'" He found no authority holding that the employer's failure to act in a humane manner itself "constituted an accident within the meaning of the Compensation act," and therefore concluded that "liability under the 'humane doctrine' can be determined only by action in the Law Courts."

He came to a similar conclusion with respect to the issue whether the defendant "undertook voluntarily to furnish aid and failed in that undertaking." If the defendant made such an undertaking, he said, "it was over and above its coverage under the Workmen's Compensation Act and a breach thereof would be recoverable only at law." As a consequence, he made no factual findings on that issue. Compensation was therefore denied on all three theories advanced.

Pursuant to our previous direction, the plaintiff thereupon appealed and petitioned this court for immediate certification, and we granted it. 31 *N. J.* 76 (1959). For the hearing of this appeal, we requested the parties to brief and argue the question whether the knowledge of Robert Ventura was chargeable to the defendant with respect to the application of the humane instincts doctrine.

.Article II of the Workmen's Compensation Act, which is applicable to the present case, provides an elective scheme of social protection from work-connected injuries. It supersedes common-law redress in tort and substitutes a strictly statutory formula for making compensation without regard to the fault of the employer or the contributory negligence or assumption of risk of the employee. *United States Casualty Co. v. Hercules Powder Co.,* 4 *N. J.* 157 (1950). The cost is allocated ultimately to the consumer through the medium of insurance whose premiums are passed on in the price of the product. 1 *Larson, Workmen's Compensation* § 1.00 (1952).

The substituted statutory liability is exclusive in cases covered by the act. *Danek v. Hommer,* 9 *N. J.* 56

(1952); *Young v. Sterling Leather Works,* 91 *N. J. L.* 289 (*E. & A.* 1917). By accepting the benefits of the act, the employer assumes an absolute liability. He gains immunity from common-law suit, even though he be negligent, and is left with a limited and determined liability in all cases of work-connected injury. On the other hand, the employee foregoes his right to sue his employer for negligence, and to obtain the common law's measure of damages in cases where fault could be shown, but he gains a speedy and certain, though smaller, measure of damages for all work-connected injuries regardless of fault. *Wilson v. Faull,* 27 *N. J.* 105 (1958). The intention is to "substitute finite liability for the fortuities of the common law remedy." *Mazzuchelli v. Silberberg,* 29 *N. J.* 15, at *page* 23 (1959).

If, therefore, it be determined that in the circumstances alleged by the plaintiff compensation is recoverable, the plaintiff's action at common law is barred. *Mazzuchelli v. Silberberg, supra.*

██ It is undisputed that it is the New Jersey, rather than New York, compensation act whose applicability must be determined. The contract of employment was made in New Jersey, for work based in New Jersey. There was only a temporary trip to New York as a part of the New Jersey employment. *Cf. Gotkin v. Weinberg,* 2 *N. J.* 305 (1949) and cases cited therein.

██ At the common law, an employer has no general duty to provide medical service or other means of relief to an ill or injured employee. But there is at least one exceptional situation in which there is such a duty, *i. e.,* when an employee becomes ill on the job, and he is rendered helpless to provide for his own care. In that situation the employer must exercise reasonable care to put in the reach of the stricken employee such medical care and other assistance as the emergency thus created may in reason require, so that the employee may have his life saved or may avoid further bodily harm. *Szabo v. Pennsylvania R. R. Co.,* 132 *N. J. L.* 331 (*E. & A.* 1945). See 2 *Harper and James,*

*Torts,* § 18.6, *p.* 1048 (1956). The cited case was the first in which the Court of Errors and Appeals had occasion to apply this rule. It was a case arising under the Federal Employers' Liability Act, 45 *U. S. C. A.* § 51 *et seq.,* and thus the issue of coverage by the Workmen's Compensation Act was not involved. That issue has not been raised or expressly decided in any other case in this country or England of which we are aware.

Our compensation law applies if Dudley's death was "by accident arising out of and in the course of his employment." *R. S.* 34:15–7. This statutory phrase requires that three separate questions be determined. In the order in which this opinion will treat those questions, a death is compensable only if (1) it arises in the course of the employment, (2) it is "by accident," and (3) it arises out of the employment.

■ It is unquestioned that Dudley died in the course of his employment; as a matter of time and space the work connection is obvious.

■■ Was Dudley's death a death "by accident" within the meaning of the compensation act? "Accident" has had a constant meaning in our act and in its English prototype since the very beginning. It is an "unlooked-for mishap or untoward event which is not expected or designed." *Bryant v. Fissell,* 84 *N. J. L.* 72 *(Sup. Ct.* 1913); *Ciuba v. Irvington Varnish & Insulator Co.,* 27 *N. J.* 127 (1958); *Fenton v. Thorley & Co., Ltd.,* [1903] *A. C.* 443. "Injury by accident" or "death by accident" mean nothing more than "accidental injury" or "accidental death" as the terms are popularly used. *Ciuba v. Irvington Varnish & Insulator Co., supra; Clover, Clayton & Co., Ltd. v. Hughes,* [1910] *A. C.* 242.

It has become clear that a court may adopt the foregoing definition without necessarily committing itself to a result on a particular set of facts. *Cf. Ciuba v. Irvington Varnish & Insulator Co., supra,* with *Seiken v. Todd Dry Dock, Inc.,* 2 *N. J.* 469 (1949); and see 1 *Larson, Workmen's Compensation,* § 37.20 (1952). Also *cf. Bryant v. Fissell, supra,*

84 *N. J. L.,* at *page 75,* with *Bollinger v. Wagaraw Building Supply Co.,* 122 *N. J. L.* 512, at *page 520* (*E. & A.* 1939).

Dean Larson convincingly argues that the "by accident" requirement has been used by the courts as a limitation on compensation awards for injuries or deaths not really caused in any substantial degree by the employment. It therefore has assumed a function perhaps better satisfied by directly viewing the problem in terms of medical causation within the framework of the requirement that the injury or death "arise out of" the employment. 1 *Larson, supra,* § 38.80 *et seq.* Dean Larson also points out that the tremendous volume of cases deciding whether particular injuries or deaths were "by accident" speak in terms of the unexpectedness of the cause or the result and the traceability to a definite time or occasion of the cause or result. 1 *Larson, supra,* § 37.20. See, *e. g., Liondale Bleach, Dye & Paint Works v. Riker,* 85 *N. J. L.* 426 (*Sup. Ct.* 1914); *Smith v. International High &c., Co.,* 98 *N. J. L.* 574 (*E. & A.* 1922).

We shall save, for a time when it may be required, an attempt to resolve the inconsistencies that have grown up in the law around the term "by accident." For whatever viewpoint is taken, it is clear that the instant case presents a death "by accident."

■ Clearly, the alleged cause of death was accidental; Dudley's death resulting from the alleged negligent failure to procure aid was an "unlooked-for mishap or untoward event which is not expected or designed." And as to the traceability of the cause and result to a definite occasion, the alleged circumstances show clearly the time and place of the alleged negligent conduct and of Dudley's death. On any view of the matter the "by accident" requirement is satisfied in the present case.

■ The final question is whether Dudley's death arose out of his employment. A death arises out of the employment if it is causally connected to the employment. It does not matter that one of the contributing causes of the death or injury was a disease or condition unrelated to the employ-

ment as long as the employment was also a contributing factor. *Ciuba v. Irvington Varnish & Insulator Co., supra,* 27 *N. J.,* at *page* 134. Thus in *Reynolds v. Passaic Valley Sewerage Commissioners,* 130 *N. J. L.* 437 *(Sup. Ct.* 1943), affirmed 131 *N. J. L.* 327 *(E. & A.* 1944), the court affirmed a compensation award to a worker who suffered an epileptic seizure on the job and was injured by falling against a hot stove. It held that the stove was a condition of the employment that contributed to the employee's injury. The court said:

"The sound rule is that whenever conditions attached to the place of employment or otherwise incident to the employment are factors in the catastrophic combination, the consequent injury arises out of the employment." 130 *N. J. L.,* at *page* 443.

In contrast, in *Henderson v. Celanese Corp.,* 16 *N. J.* 208 (1954), a worker who fell to a concrete floor during an epileptic seizure, striking and injuring his head, was denied compensation. This court adopted the rule set forth in the *Reynolds* case, but a closely divided court distinguished the case on the ground that, unlike the hot stove, the concrete floor was not a "hazard or special condition of employment," for "the same consequences would probably have been forthcoming had the appellant suffered his seizure in the street or in his home."

There are many cases holding that when a worker's preexisting disease or weakness, unrelated to his employment, is aggravated or accelerated by employment strains, trauma, or other conditions, the resulting injury or death is compensable. See, for example, *Marshall v. C. F. Mueller Co.,* 135 *N. J. L.* 75, 76 *(Sup. Ct.* 1946), and cases cited therein. See also 1 *Larson, supra,* § 12.20. The question in these cases is wholly one of medical causation: Was the employment a contributing factor? These cases are analogous to the one under consideration. If as the combined result of an employee's work and the pre-existing weakness of his back, he suffers an injury, his injury arises out of his em-

ployment. In just the same way, if a man suffers a non-work-connected heart attack on the job and, as a result of the conditions or risks of his employment, necessary medical aid is withheld and he therefore dies, then his death arises out of his employment. In such a situation, it cannot be denied that a condition or risk incident to the employment was a factor in producing "the catastrophic combination" resulting in the death. See *Reynolds v. Passaic Valley Sewerage Commissioners, supra,* 130 *N. J. L.,* at *page* 443.

If a coal miner, miles from access to the surface of the earth, were to suffer a non-work-connected heart attack, and despite the best efforts of everyone to obtain medical aid it were so delayed by distance that as a consequence he died, no one would doubt that his work, by depriving him of the normal access to medical aid that would have saved him, substantially contributed to his death.

Similarly, if a worker suffered a non-work-connected injury on the job, and a fellow employee went to seek aid in satisfaction of a duty imposed by the common law, and he found the means of communication or transportation from the work site to the source of aid destroyed for a reason related to the employment, and, as a consequence aid never arrived and therefore the worker died, the circumstances of his employment would have substantially contributed to his death.

In these situations, the parallel operative facts are (1) a non-work-connected injury, (2) a common-law duty arising in another to take care to procure medical aid, (3) non-procurement of that aid for a reason related to the employment, and (4) resulting death. Clearly the conditions of employment, *i. e.,* either distance from available aid or failure of the means to communicate from the place of employment to those able to furnish aid, were substantial factors contributing to the death.

We are aware of no reason why a case of negligent failure to procure aid should be treated differently. The essentials of the two hypothetical cases are present, and just as surely the conditions of employment substantially

contribute to the death. In the first hypothetical case, the work connection was that the stricken worker was prevented from obtaining aid by the nature of the place at which he had to work. In the second hypothetical case, the work connection was that aid was withheld by inability to communicate from the work site to agencies from whom aid could have been obtained. In the present case, the work connection is the alleged negligent failure of a fellow employee to satisfy the common-law duty to make reasonable efforts to procure aid, after having assumed to do so, or after he knew or should have known of the emergent need therefor.

The requirement that the claimant must prove negligence in order to obtain compensation in the circumstances presented here arises from the fact that it is the negligence that satisfies the statute's requirement that the death arise out of the employment. If Funke had taken reasonable steps to procure medical aid and, for a reason unrelated to the work situation, was unable to do so, then his conduct would have had no causal relation at all with the failure of aid to arrive and the consequent death. The unavailability of aid would have been due to something entirely divorced from the stricken worker's employment. For example, if Funke had called a physician who promised to go to treat Dudley, and who then forgot to go, and Funke and Dudley reasonably relied on the physician's assurances, there would be no cognizable causal link between the failure of aid and Dudley's employment. Only when it is some element of the work situation that contributes to the failure of aid can the resulting death be said to have arisen out of the employment. In the present case, if such an element exists, it must be the conduct of Dudley's superior employee, Funke, or co-employee, Ventura. If their conduct was reasonable in all the circumstances, then there would be no causal relation between Dudley's employment and his death. The consequences of his heart attack would have been the same whether or not he had been stricken while at work,

for it would be speculative, at best, to conclude that another person, acting reasonably, would have done more. If Funke or Ventura was negligent, however, in failing to procure medical aid, and their negligent conduct was a contributing cause of Dudley's death, then in every realistic sense, the death grew out of Dudley's work situation. It is clear that the danger, inherent in the work situation, that others will not satisfy their duty to render aid required by the law, is a risk of the employment.

It may be objected that our analysis makes compensation depend on proof of fault, in the face of the statute's direction that compensation be awarded or withheld "without regard to the negligence of the employer." *R. S.* 34:15–7. This has been the most troublesome aspect of the present case. But the fact is that in the circumstances of this case it is only the alleged negligence that makes the death one "arising out of" the employment. If that negligence was not present, neither would there be a work connection, for the risk to which Dudley's employment exposed him, and which allegedly eventuated in his death, was the risk of failure of aid that the law demands.

The reasoning we have used above applies with equal force to a case where a superior employee or fellow worker gratuitously assumes to render or procure aid, and negligently fails to do so. If, as is alleged here, Funke did assume that function, even if he were under no duty to do so, he also assumed the obligation of using due care for Dudley's safety and welfare. *Bascho v. Pennsylvania R. Co.,* 3 *N. J. Super.* 86, at *page* 92 (*App. Div.* 1949). See also 2 *Restatement, Torts,* §§ 323–25 (1934); 2 *Harper and James, Torts,* § 18.6 (1956). If, by his assumption to act and subsequent negligent failure to do so, Funke contributed to Dudley's death, he breached a duty imposed by the common law. The breach of the assumed duty was the realization of a risk of the employment in exactly the same way as is a breach of the duty to render or procure emergency medical aid. And, in just the same way, a death

resulting from such breach of duty arises out of the employment.

The Deputy Director concluded that any voluntary assumption of the duty to furnish medical aid would be over and above the employer's coverage under the compensation act. We disagree. We do not believe that there was a "contractual excess" situation here, in which the employer contracted to provide benefits beyond those required by the statute. See 2 *Larson, Workmen's Compensation,* § 97.60 *et seq.* (1952).

As the Deputy Director made no factual findings on the issues we have discussed in this opinion,. except on the issue of the work connection of the heart attack as such, the cause must be remanded, in order that a determination be made upon full factual findings whether there was negligent conduct on the part of Funke or Ventura, or both, and if there was, whether such conduct was a causal factor contributing to Dudley's death.

For the reasons set forth above, the judgment of the Appellate Division is reversed and the judgment of the Law Division is affirmed. This determination necessarily leads to the further conclusion that the compensation matter be remanded to the Workmen's Compensation Division for further proceedings consistent with the views expressed in this opinion.

*For reversal*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR and HALL—6.

*For affirmance*—None.