81 N.J. Super. 75 (1963)
194 A.2d 596
ANN BAGINSKY, PETITIONER,
v.
AMERICAN SMELTING & REFINING CO., RESPONDENT.
Superior Court of New Jersey, Middlesex County Court, Law Division.
Decided October 25, 1963.
*76 Messrs. Balk & Jacobs for petitioner (Mr. Jacob L. Balk, of counsel; Mr. Allen S. Goldberger, on the brief).
Messrs. Seaman & Clark for respondent (Mr. Francis M. Seaman, of counsel; Mr. John P. Kozak, on the brief).
MOLINEUX, J.C.C.
This is an appeal from a compensation award allowed a petitioner by reason of the death of her husband from a heart attack, and presents for determination in a somewhat different form the issue involved in Dwyer v. Ford Motor Co., 36 N.J. 487 (1962).
Petitioner's decedent first went to work for respondent on January 16, 1939, and continued such employment until February 19, 1960, the day prior to his death.
His work record, commencing with 1956, was introduced into evidence, disclosing continuous employment except as follows: 1956, three weeks' vacation; 1957, one day reported off; 1958, three weeks' vacation, six days reported off (not consecutive); 1959, did not work from August 20 to December 10 because of strike.
Decedent's job consisted of operating a crane. To reach the crane decedent was required to walk about half a mile from *77 the entrance gate of respondent's plant and to make the return trip on completion of the day's work. Location of the crane was at an elevation of 7.13 feet, and the elevation of the gatehouse between 29.45 feet and 33.27 feet, so that to reach his place of work, decedent was required to descend a distance of from 22.32 to 26.14 feet and to ascend the same distance at night. As heretofore stated, the change in grade was effected over a distance of about half a mile. There were at least three ways to transverse this distance, some more arduous than others. The testimony is silent as to which was actually used by decedent.
The crane operated by decedent was mounted on a railroad car. To reach the cab it was required that decedent ascend five steps (including the floor of the cab), so arranged as to require a perpendicular ascent. The floor of the cab was approximately seven feet above the ground. The cab was glass-enclosed but the windows were open or shut as the weather might require. To operate the crane there was a series of hand levers and foot pedals. As to the number of such levers and pedals actually used there is some dispute, but it is unquestioned that at least five levers and two pedals were used. It is said by respondent that the operation of the crane required no more physical effort than that required to operate an automobile with a mechanical shift and mechanical hand brakes. The evidence offered by petitioner suggests the need of more strenuous effort.
In addition to working for respondent, decedent drove an oil delivery truck. This work ceased in 1957.
Petitioner's decedent was treated from time to time by Dr. Matthew F. Urbanski, plant physician of respondent. The plant health records and Dr. Urbanski's records indicate the gradual development of a condition of heart failure. On April 8, 9, 11, 12 and 16, 1954, decedent suffered from nose-bleeds due to hypertension. On June 18, 1954 he was given an anti-hypertensive medication. On February 13, 1955 Dr. Urbanski examined him and noted that decedent suffered from hypertension. Similar findings appear on Dr. Urbanski's *78 records as of June 12, 1955 and July 1, 1957. On October 30, 1957 decedent suffered from a congested chest, chills and fever. On December 12, 1957 he suffered from excessive gas, a bad taste in his mouth, and he complained of not sleeping well. Dr. Urbanski's records as of January 27, 1958, February 20, 1958 and March 27, 1958, indicate that decedent suffered from hypertension.
In the early part of 1958 decedent developed a swelling of the leg, shortness of breath, a gurgling sound on breathing, an inability to sleep, and an overall feeling of tiredness. On August 4, 1958 decedent suffered from edema of the ankles and rales were noted in the chest. Because of these conditions an X-ray was taken of decedent on August 12, 1958 at Roosevelt Hospital. The X-ray report contains the following notation:
"Haziness at the inner zones of both lungs, more on the right side, probably due to pulmonary emphysema. The heart is markedly enlarged to the right and left and globular in shape. The upper mediastimum is widened. Impression  cardiac enlargement with decompensation. Pulmonary congestion. Recommendation: hospitalization (preferably in a general hospital)."
In spite of the recommendation for hospitalization, decedent continued to work. On September 19, 1958 he was given an anti-hypertensive tablet. On September 29, 1958 his legs swelled and his blood pressure was high. On January 12, January 26, March 13 and June 8, 1959 he was given more anti-hypertensive tablets. Dr. Urbanski reported hypertension as of June 12, 1959; cirrhosis of the liver and hypertension as of January 6, 1959; hypertension as of March 13, 1959; hypertension, decompensation and "cardiovascular migraine" as of August 18, August 26, August 28, September 1, September 8 and September 14, 1959. On November 9 and December 1, 1959, and on January 25, 1960, he found the same. Decedent was on medication for the condition thus found by the doctor. On February 20, 1960 decedent died of a cardiac attack, details of which are hereinafter more fully discussed.
*79 Petitioner testified as to the condition suffered by her husband. Sometime during 1958 he ceased walking to work, as had been his custom, and either drove or was driven to and from work because of his impaired physical condition. While petitioner testified as to these circumstances, she was unable to pinpoint any particular day on which decedent exhibited the symptoms as outlined.
She further testified that on one occasion in the latter part of January 1960 he left for work early but returned soon thereafter, complaining of shortness of breath. He directed his wife to call respondent and report that he was ill. Petitioner testified that respondent's representative directed her to advise decedent that he would have to appear for work the next day. It is said that decedent then directed his wife to call again and request a three-week vacation, that said request was refused, and that petitioner then called someone higher in respondent's echelon, whereupon he was granted a single week's vacation. Company records show that decedent was on vacation during the week of January 25, 1960.
Respondent's recitation of this incident is to the effect that a call was received requesting a week's vacation, that this request was granted after a second call to respondent, and that no mention was made of sickness.
Petitioner testified that decedent's condition grew worse subsequent to the week of vacation.
It is important to point out that, with the exception of the testimony of one witness, the record does not indicate that at any time while decedent was actually at work his condition was such that he could not perform his duties, nor that his work adversely affected his condition, nor were there any specific instances of any need to quit work temporarily, nor even any complaints of pain or discomfort. At all times his work seems to have been satisfactorily performed. The single witness who suggests anything to the contrary is Joseph Baginsky, decedent's son, who testified that he worked for respondent during January 1960, approximately two weeks prior to his father's death, on the night shift following the shift on *80 which his father worked. He testified that he saw his father at or near the gatehouse on the latter's way home, and his father then appeared to be breathing heavily. He stayed with his father until his father felt able to drive off in his own car, and the witness then went on to his work.
Contrariwise, there is considerable testimony offered by respondent, consisting of testimony of decedent's fellow workers to the effect that he worked normally at all times, including the day prior to his death.
It should be here stated that the judge in compensation rejected the evidence of decedent's fellow workers to the effect that there was no incident on the last day of decedent's employment. The judge in compensation was impressed by the "testimony of petitioner and her son as more in line with the actualities as presented by the proofs." So far as the last day of decedent's employment is concerned, there is no testimony of any untoward incident or any manifestation of any pain or suffering or inability to work. The judge in compensation also relied upon the medical testimony of petitioner to the effect that the testimony of decedent's fellow workers "doesn't make any sense," such testimony being completely rejected.
The burden of proof being upon petitioner, the finding of the court below is rejected. It is found as a fact that on the last day of employment there was no incident or moment of manifestation which in any way can be related to decedent's condition.
Decedent quit work on February 19, 1960, punching out at 10:45 P.M. As to his activities from that time to his death, we have no testimony except that presented by petitioner and decedent's children. Decedent apparently retired that night without incident. He arose early, as was his custom. Petitioner arose at about 9 A.M. and found that her husband was already up. At about 9:30 she served him a breakfast of oatmeal and Sanka coffee. During the morning he walked and sat around the house. About noontime they both went to the supermarket, the husband driving the car. They "went all over" the market and the petitioner, not the decedent, pushed *81 the shopping cart around the market and to the automobile and placed the purchases in the car. They were in the market for about an hour. They then visited their daughter and grandchildren in Fords, arriving approximately at 1:30 P.M. In order to reach the daughter's house it was necessary to climb three steps. At the daughter's house decedent sat quietly, and he and petitioner left there at about 2:30, arriving home at about 2:45. Petitioner, not decedent, brought the purchases into the house. The total distance driven by decedent from his home, to the market, to his daughter's house and home again was approximately seven or eight miles. Upon arriving home decedent, after resting a while, went to the telephone to call his son. At the telephone he sat down, dialed and then slumped over the phone. There was no warning of this attack. The First Aid Squad and Dr. Urbanski were notified. Representatives of the First Aid Squad arrived and attempted to give decedent oxygen. Thereafter Dr. Urbanski arrived and found decedent "pulseless." "He took two breaths and he was dead." Death occurred at about 4:30 P.M. The doctor issued a death certificate wherein the cause of death was noted as: "Acute coronary occlusion (instant); arteriosclerotic hypertensive cardio vascular disease (2 yrs)."
There is no testimony as to any untoward incident or "moment of manifestation" on the day of the death except testimony by the daughter of decedent that at the time of his arrival at her home he was somewhat out of breath.
During the 1959 strike decedent took part in the maintenance of a picket line at respondent's plant. The extent of such activity was not disclosed. While decedent was said by his family to have felt better during this period, he was treated eight times by Dr. Urbanski, who stated that his condition did not improve at that time.
Petitioner offered the testimony of Dr. Saul Lieb. On direct examination Dr. Lieb expressed an opinion as to decedent's death as follows:
"[Decedent's death] merely represented the end result of the man in severe congestive heart failure secondary to hypertensive and arteriosclerotic *82 heart disease. And I feel that his work which he performed in the period from 1958 on, until the day before his death, certainly was a major contributing factor in the aggravation and acceleration of his heart disease, to increase the extent of his congestive heart failure. So that he died as an end result of that congestive heart failure. * * * It was my opinion that he died much sooner than he would have if he had not been subjected to this work."
From Dr. Lieb's testimony it is patently clear that he gave as the cause of death the total work effort of decedent during his employment, at least from August 12, 1958 (date of X-rays). On cross-examination, Dr. Lieb testified as follows:
"Q. Doctor, was there any particular incident in the course of his employment on the day before he died that would indicate any contribution to his death?
A. I am assuming that he did his usual work the day before he died, and I would think that this constituted a series of exertions which, as I said before, were inadvisable for anyone with this degree of advanced heart disease, and I think they would contribute to his death.
Q. In other words, you feel that  you don't mean just this one day before, but the culmination of his efforts the day he went back to work following the strike to the day of his death; is that right?
A. That's right.
Q. So that separating the day before his death alone is not your guiding factor here in the contribution of that work effort toward his death?
A. That's right.
Q. And that so far as the testimony before you is concerned, there was no untoward incident in this man's work the day before his death?
A. No. I have nothing before me that shows that there was any single untoward incident.
Q. Doctor, I take it, then, that you take the position that perhaps the accumulation or the cumulation of the work effort over this period of time from the termination of his strike to the day of his death caused his death, and no particular single incident or series of incidents was responsible for it?
A. I think that's right.
Q. In other words, the effort that you say that he exerted at his place of employment, together with the effort of his ordinary daily living, both had a cumulative effect on the ultimate death; isn't that so, Doctor?
A. I would say so, with the reservation that, of course, the efforts involved in his daily living would certainly not be equivalent to these heavy work efforts."
*83 The doctor insisted that the entire work effort contributed to the death and that death at the time it took place was not merely the natural progress of the disease alone:
"Q. Doctor, what do you find, if anything, that specifically evidenced the worsening of this man's condition due to his work, rather than the natural progress of the disease alone?
A. The conclusion I made is based upon all the facts in the hypothetical question, that there was a deterioration, aggravation of his congestive heart failure during a period when he was engaged in this heavy physical exertion. I couldn't possibly remove that factor of heavy physical exertion which he had in his work surroundings, particularly in a man who in August 1958 had such an advanced degree of congestive heart failure that the treatment should have been to put him to bed.
Q. So that you can't find anything specifically that evidences the worsening of this man's condition due to his work; is that it?
A. There was deterioration of his cardiac condition while he was engaged in heavy physical work.
Q. I appreciate that.
A. I am assuming that there is a cause-and-effect relationship here.
Q. From a culmination of all his efforts?
A. That's right.
Q. But you don't find anything specific as such which worsened this man's condition due to his work rather than the natural progress of his disease alone, do you, Doctor? In other words, Doctor, it was a culmination of both, wasn't it?
A. This man, as I have indicated, had far advanced congestive heart failure in 1958.
Q. I know. You told us that.
A. And treatment should have been  he should have been in bed. He deteriorated thereafter while he was engaged in heavy physical exertion, which was medically contra-indicated. In my opinion, there is a cause and effect between this deterioration. There is nothing natural about cardiac deterioration that goes on while somebody is working very hard, while he should be in bed. This has nothing to do with the natural progress of the disease.
Q. Doctor, is the type of disease that this man had naturally progressive?
A. I would say over the very long run, it has a tendency to be progressive, but you can hold it at a plateau with proper treatment for very long periods of time.
Q. Doctor, isn't it a fact that the progressive nature of arteriosclerotic heart disease  strike that. Isn't it a fact that arteriosclerotic heart disease progresses relentlessly and without the intervention of strain, emotion or effort?
A. No, that is not so."
*84 Dr. Lieb further testified on cross-examination:
"Q. So that we can fully understand each other here, Doctor, it is your conclusion in this case that this man died of congestive heart failure as a result of a cumulative effect of his employment, specifically from the period of December 10, 1959 to the date of his death?
A. That's right.
Q. And would it be fair to say that the ordinary effort of his daily living likewise contributed to this degenerative process and his ultimate death?
A. Yes, but in lesser degree than his work."
Petitioner's thesis is therefore clearly delineated that decedent died of a congestive heart failure aggravated by his total work effort and, indeed, aggravated by any physical exertion.
The theory of respondent is that decedent died of a coronary occlusion unrelated to his work effort. Dr. Urbanski, who had treated decedent for several years, "gave it as his opinion that death was caused by an acute coronary occlusion." In view of Dr. Urbanski's familiarity with decedent's condition, including his presence at the time of death, his opinion is of importance. Dr. Urbanski stated that he did not believe that decedent died of a congestive heart failure and insisted that his death was not work-connected.
Dr. Jerome G. Kaufman, relying upon a hypothetical question, testified that in his opinion decedent died from an acute coronary occlusion unrelated to the employment. Dr. Kaufman gave his reasons for this opinion, which need not be here repeated. Dr. Asher Yaguda also testified for respondent and reached a conclusion similar to that of Dr. Kaufman.
Further analysis of the medical testimony is required. Respondent admits in its brief that decedent had been suffering for some time from a congestive heart failure. The X-ray report recommended hospitalization. In the light of such a recommendation it can hardly be said that continued work by decedent would do anything other than aggravate the then existing condition. Dr. Urbanski, the plant physician, testified that he had recommended to decedent that "he should let down on his work for a period of time" and that he felt *85 that this was important, and by "let down on his work" he meant not to work at all, and that such advice had been given on several occasions. Dr. Kaufman, called by respondent, testified that his work "may have affected him"; that if upon examination of decedent he had found congestive heart failure, he would have included rest in his recommendations for treatment. He further testified:
"Q. Will work effort increase congestive heart failure?
A. If a man is in failure, work effort would increase it; it would be contra-indicated, and I have so testified. * * *
A. I think I have testified that if I were treating this man, I would not put him at laborious work. * * *
Q. Taking all these facts into account, Doctor, I will ask you this question: in your opinion, under these circumstances, should this man have been doing the work that he was doing for the respondent company?
A. I would say that if he were my patient, with the experience I have as internist and cardiologist, I would not advise it. * * *
THE WITNESS: Well, first of all, there is a lack of consistency here. With this x-ray which was taken, I think, approximately the same day; with a note here of `heart negative.' I don't understand that because this man did have on this x-ray an enlarged heart. And in view of the wheezing, rales and enlarged heart, on that day, if I saw him, I certainly would not have sent him to work."
Dr. Yaguda admitted that one of the most important parts of the treatment for a congestive heart failure was rest.
From the record before the court, the court finds that the petitioner has proved by a fair preponderance of the evidence that (1) decedent was suffering from a congestive heart disease prior to his death, and (2) the entire work record of decedent aggravated such condition.
The issue remains, however, as to whether the death of February 20, 1960 was caused by the congestive heart failure or by a coronary occlusion. It should be pointed out that it has been assumed by all that if the death was caused by coronary occlusion, it was not work-connected. Dr. Lieb at no time advanced the theory that the work effort caused a coronary occlusion. His entire thesis is that the entire work effort, including, but by no means limited to the last day of work, *86 caused an aggravation of a congestive heart failure and that decedent died from such congestive heart failure.
We are of the opinion that petitioner has failed to prove by a preponderance of the evidence that decedent died from congestive heart failure. In fact, the evidence tends to sustain rspondent's position. Such a finding, coupled with the assumption made by both sides that death by coronary occlusion would not have been work-connected, requires the reversal of the judgment entered below.
But an examination of the issues here raised requires some comment on the question of compensability if it were found that death was caused by the congestive heart failure. The record below amply sustains a finding that decedent suffered from such condition and that it was aggravated by decedent's work record over a period of at least 18 months. Under such circumstances, is petitioner entitled to compensation? It was said in Dwyer:
"Compensability arises whenever the required exertion is too great for the man undertaking the work, whatever the degree of exertion or condition of his heart." (36 N.J., at p. 491)
"In short, where the heart has deteriorated to the point that potentially any appreciable degree of exertion carries a danger of precipitating, or so acting upon the condition as to accelerate, a disabling or fatal attack, if the effort or strain, which in fact precipitates or contributes to the attack, occurs during the course of the employment and as an ordinary or usual incident of the work, the resulting disability or death is compensable. Benefits are not lost because the amount of the work stress was such that it might or could be duplicated in routine activity about the home or in customary movements or effort while there." (36 N.J., at p. 492)
"If the effort or strain, whether great or little, was an incident of the employee's work and either alone or in combination with disease played a material part in causing, contributing to or accelerating a heart attack, the attack is compensable." (36 N.J., at p. 497)
In referring to the "effort or strain" of the work, did the court mean the effort or strain accumulated over years of work, or did it mean some effort or strain suffered appreciably near to the attack resulting in death? If it be the former and if one assumes, as one must, in the light of the medical testimony *87 offered below, that rest was here the required treatment, then such interpretation, as applied to the present facts (i.e., that death was caused by congestive heart failure instead of coronary occlusion), would for all practical purposes constitute a holding by this court that congestive heart failure is an occupational disease. Such result would be required in any future case where the employment demanded any activity beyond that allowable under a treatment of rest. It is not conceived that Dwyer meant to go so far.
In the first place, the facts of Dwyer do not require any such result. In that case decedent had suffered a heart attack about two years prior to his death. He had recovered sufficiently to return to work. On April 27, 1958 he suffered a heart attack at home. On the 28th he stayed away from work. On the 29th he returned to work with the approval of his doctor. He performed certain manual tasks and showed the effects thereof. He looked tired and white, walked at an unusually slow pace, did not eat his lunch and looked "as though he could not carry on his usual work." He went home sometime after 10:30 P.M. and died the next morning at 3:20 A.M. The issue in Dwyer was whether his work on the 29th was causally connected with his death on the early morning of the 30th.
It should be repeated here that petitioner's decedent in the instant case suffered no attack of any kind while at work. At no time was he unable to perform his duties because of his heart condition; there was no moment of manifestation or any specific incident during work.
In Dwyer emphasis is laid on the existence of a moment of manifestation or specific incident during working hours. While the finding of such a moment or such a specific incident is not necessary to allow compensation, yet their existence is of importance evidentially in establishing causation. The court holds that such evidence of causation must be beyond de minimis. Petitioner's theory here expounded assumes that nothing unusual happened during the last few days of decedent's employment and that work during this *88 period was proportionately limited, as a causative factor, to the ratio which that time period bore to decedent's total employment from the date of the onset of his illness to his last day of employment. This would be de minimis.
In Dwyer the court cited some 13 cases in other jurisdictions. In all but one there was a moment of manifestation while decedent was at work. As to our New Jersey cases following Dwyer, in Hewett v. Standard Concrete Block and Supply Co., 38 N.J. 531 (1962), it appears that it was admitted by all that the day's work effort could precipitate the attack, and the only issue before the court was factual as to whether an attack 25 to 30 minutes after the cessation of work was caused by the work effort. This case in no way suggests that work effort over a long period of time causing aggravation is sufficient to justify a finding of causation. In Shapiro v. Newark Steel Drum Co., Inc., 72 N.J. Super. 220 (App. Div. 1962), the onset of pain in the chest and a burning sensation occurred while the claimant was at work. In Bacon v. Atlantic City Transportation Co., 72 N.J. Super. 541 (App. Div. 1962), affirmed 38 N.J. 529 (1962), the evidence tended to show that the petitioner broke out in a terrific sweat and experienced pain in his chest while driving his bus. The holding in that case is limited to a declaration that it was not necessary to prove that the attack suffered while on the job was precipitated by a near accident. In Wilsey v. Reisinger, 76 N.J. Super. 20 (App. Div. 1962), the decedent employee was found dead on the job. It was said that this fact, without more, is not sufficient to sustain a finding that the heart attack was caused by the work. In Fagan v. Newark, 78 N.J. Super. 294 (App. Div. 1963), there is no question but that the attack occurred while the employee was at work; and in Booker v. James Spence Iron Foundry, Inc., 80 N.J. Super. 68 (App. Div. 1963), there was evidence to indicate that the attack occurred while decedent was engaged in his employment.
In each of these cases the workman suffered from a heart condition known to be existent prior to the fatal or *89 disabling attack. It is true that the language of Dwyer, literally applied, may be construed to suggest compensability where the work effort aggravated the disease, without the necessity of the attack's occurring while the workman was actually employed. However, the emphasis in Dwyer upon the evidential importance of the closeness of the attack to the last employment indicates that the court did not intend to go so far as to suggest that aggravation effectuated over a long period of time prior to the attack was sufficient to find compensability. It is likewise true that the court has laid down no specific standard or test as to when aggravation shall give rise to compensability, or when it shall not. Suffice is to say here that this court is of the opinion that Dwyer does not go so far as to hold that aggravation over a period of some 18 months is sufficient, without more, to justify a recovery. For these reasons the judgment below is reversed.